UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| RENEE LAMANNA FARALLI | ) | CASE NO. 1:06CV0504 |
| | ) | |
| Plaintiff | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| HAIR TODAY, GONE TOMORROW, | ) | |
| LLC, et al. | ) | |
| | ) | |
| Defendant | ) | |

---

**DEFENDANTS HAIR TODAY, GONE TOMORROW, LLC AND DONALD TIETZ'S MEMORANDUM IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

---

Murray K. Lenson (0021928)
Kate E. Ryan (0068248)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street – Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile: (216) 583-7001
mlenson@ulmer.com
kryan@ulmer.com

Attorneys for Defendants Hair Today, Gone Tomorrow, LLC and Donald Tietz

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii, iv, v

I.     SUMMARY OF THE ARGUMENT. ................................................................. 1

II.    STATEMENT OF RELEVANT FACTS. ........................................................... 3

  A.   LAMANNA'S INTRODUCTION TO HTGT. ............................................... 3

  B.   HTGT IS NOT AFFILIATED WITH SOFT LIGHT. ..................................... 4

  C.   THE EPILIGHT DEVICE. ............................................................................ 4

  D.   HTGT'S HAIR REMOVAL SERVICES. ....................................................... 6

  E.   HTGT'S INFORMED CONSENT. ................................................................ 8

  F.   HTGT'S ADVERTISING. ............................................................................. 8

  G.   PLAINTIFF'S HTGT TREATMENTS. .......................................................... 9

III.   PLAINTIFF'S CLAIMS AGAINST HTGT. ....................................................... 11

IV.    THIS COURT SHOULD DENY THE MOTION FOR CLASS
       CERTIFICATION. ............................................................................................ 14

  A.   THE RULE 23 STANDARDS. ...................................................................... 14

  B.   PLAINTIFF'S OHIO CONSUMER SALES PRACTICES ACT CLASS
       CANNOT BE CERTIFIED. .......................................................................... 17

  C.   THIS COURT CANNOT CERTIFY A "FRAUD ON THE FDA" CLAIM. ....... 18

  D.   PLAINTIFF CANNOT ESTABLISH THE CLASS
       CERTIFICATION PREREQUISITES. ........................................................... 19

       1.   The Purported Class Is Overbroad and Ambiguous. ................................ 19

       2.   Plaintiff Lacks Standing and Is Not a Member of the Purported Class. ....... 21

       3.   Plaintiff Cannot Establish the Commonality and Predominance Prerequisites. .......... 22

            a.   Questions of Individual Reliance Preclude Class Certification. ............... 25

            b.   This Court Should Not Certify a Multi-State Class. ............................... 27
            c.   The "Rescission" Claim Does Not Establish the "Predominance" Prerequisite. ...... 29

i

4.      LaManna's Claims Are Not Typical Of The Claims Of The Proposed Class. ............. 30

5.      Plaintiff Is Not an Adequate Class Representative. ....................................................... 31

6.      A Class Action Is Not A Superior Means To Adjudicate Plaintiff's Claims ................ 32

V.      CONCLUSION. ................................................................................................................ 34

CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1 ................................................. 35

CERTIFICATE OF SERVICE ..................................................................................................... 35

## **TABLE OF AUTHORITIES**

**Cases**

*Adashunas v. Negley*, 626 F.2d 600 (7th Cir. 1980) ....................................................... 19

*Amchem Prods., Inc. v. Windsor*, 83 F.3d 610 (3rd Cir. 1996) ............................... 22, 23

*Barber v. Meister Protection Serv.*, Cuyahoga App. No. 81553, 2003-Ohio-1520..................... 20

*Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471 (S.D. Ohio 2004) ............................... 16

*Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568 (W.D. Tenn. 2004).................. 30

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) .................................... 18

*Castano v. American Tobacco Co.*, 84 F.3d 734 (5th Cir. 1996) ............................ 25, 27

*Chamberlain v. American Tobacco Co., Inc.*, 1:96CV2005, 1999 U.S. Dist.
     LEXIS 5843 (N.D. Ohio Apr. 12, 1999)............................................... 14, 15, 22, 23

*Chaz Concrete Co., LLC v. Codell*, No. 3:03-52-KKC, 2006 U.S. Dist.
     LEXIS 60013 (E.D. Ky. Aug. 23, 2006) ............................................. 16, 19, 21, 31

*Daubert v. Merrill-Dow Pharm., Inc.*, 509 U.S. 579 (1993) ......................................... 5

*Denny v. Deutsche Bank*, 443 F.3d 253 (2nd Cir. 2006) ................................... 19, 25, 29

*FTC v. Removatron Intl. Corp.*, 111 FTC 206 (1988), aff'd, 884 F.2d 1489
     (11th Cir. 1989), modified, 114 FTC 715 (1991) .................................................. 18

*General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)............................................. 15, 30

*Georgine v. Amchem Prods.*, 88 F.3d 610 (3rd Cir. 1996) ......................................... 27

*Hoang v. E\*Trade Group, Inc.*, 151 Ohio App. 3d 363, 2003-Ohio-301 ...................... 14, 20, 26

*Howland v. Purdue Pharma L.P.*, 104 Ohio St. 3d 584, 2004-Ohio-6552............................ 21, 23

*In re American Med. Sys.*, 75 F.3d 1069 (6th Cir. 1996)................................. 14, 22, 27, 31, 32

*In re Jackson Nat'l Life Ins. Co. Premium Lit.*, 183 F.R.D. 217 (W.D. Mich. 1998) ................. 28

*In re Northern Dist. of Calif., Dalkon Shield IUD Prods. Liab. Litig.*, 693 F.2d 847
     (9th Cir. 1982)............................................................................ 28, 29

*Jones v. Allercare, Inc.*, 203 F.R.D. 290 (N.D. Ohio 2001) .......................................................... 23

*Kohn v. American Hous. Found., Inc.*, 178 F.R.D. 536 (Colo. 1998) ........................................... 24

*Lynn v. Roto-Rooter*, 2004-Ohio-2559, 2004 Ohio App. LEXIS 2274 .................................. 20, 25

*Marks v. C.P. Chemical Co., Inc.*, 31 Ohio St. 3d 200, 509 N.E. 2d 1249 (1987) ...................... 25

*Marrone v. Philip Morris USA*, 110 Ohio St.3d 5, 2006-Ohio-2869 .................... 2, 17, 18, 25, 30

*O'Neill v. Gourmet Sys.*, 219 F.R.D. 445 (W.D. Wis. 2002) ......................................................... 19

*Paoletti v. Travelers Indem. Co.*, No. 1-75-196, 1977 Ohio App.
    LEXIS 10181 (6th Dist. May 6, 1977) ...................................................................................... 21

*Petty v. Wal-Mart Stores, Inc.*, 148 Ohio App.3d 348, 2002-Ohio-1211 .................................... 20

*Repede v. Nunes*, 2006-Ohio-4117, 2006 App. LEXIS 4062 ......................................... 15, 20, 22

*Schmidt v. Avco Corp.*, 15 Ohio St. 3d 310, 473 N.E. 2d 832 (1984) ......................................... 23

*Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) .......................................... 26, 30

*State ex rel. Davis v. Public Emps. Ret. Bd.*, 111 Ohio St.3d 118, 2006-Ohio-5339 .................. 23

*Stirman v. Exxon*, 280 F.3d 554 (5th Cir. 2002) .......................................................................... 28

*Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000) ............................................................... 30, 31

*Warner v. Waste Mgt., Inc.*, 36 Ohio St.3d 95, 521 N.E. 2d 1091 (1988) ....................... 15, 21, 22

*White v. Best Buy Co., Inc.*, Cuyahoga County C.P. No. CV-99-387161,
    vol. 3166, pg. 0161 .................................................................................................................. 22

*Wilson v. Brush Wellman, Inc.*, 103 Ohio St. 3d 538, 2004-Ohio-5847 ...................................... 15

*Woods v. Oak Hill Cmty. Med. Ctr., Inc.*, 134 Ohio App. 3d 261,
    730 N.E. 2d 1037 (4th Dist. 1999) ........................................................................................... 21

**Statutes**
Food Drug and Cosmetic Act, 52 Stat. 1040 (1938)..................................................................... 18
Medical Device Amend., 90 Stat. 539 (1976) ............................................................................... 18
R.C. § 1345.02 .............................................................................................................................. 17
R.C. § 1345.03 .............................................................................................................................. 17
R.C. § 1345.05 .............................................................................................................................. 17
R.C. § 1345.09 ................................................................................................................... 13, 17, 30
R.C. § 1345.10 .............................................................................................................................. 29

**Other Authorities**

Ohio Adm. Code 4731-18-03 .................................................................................................. 6

**Rules**

Fed. R. Civ. P. 23 ............................................................... 1, 14, 15, 16, 22, 30, 32
Ohio R. Civ. P. 23 ........................................................................................................ 20

## I.  SUMMARY OF THE ARGUMENT.

Plaintiff Renee LaManna Faralli ("LaManna" or "Plaintiff") seeks certification of a purported "class" consisting of all customers of Defendant Hair Today, Gone Tomorrow LLC ("HTGT") from the inception of HTGT, in 1998, to the present in Ohio, Illinois, Michigan, Indiana, Kentucky and Wisconsin.  HTGT is a company that provides a cosmetic service of removing unwanted body hair via an Epilight device that the FDA approved in 1997 and re-approved in 2000.  Plaintiff asserts class action claims on behalf of more than 25,000 customers arising under six different state consumer protection statutes as well as under those states' versions of common-law fraud, all of which are predicated on the unfounded notion that HTGT's customers uniformly do not achieve the hair removal results that HTGT allegedly promised in its radio and print advertisements.

LaManna, however, did not go to HTGT because of any advertising of HTGT. Then, after just five treatments, LaManna experienced hyperpigmentation of the skin at the treated areas of her body, which precluded her from completing her course of treatment.  In addition to the class specific claims, LaManna alleges personal injury claims on her own behalf, but not on behalf of any other customers that are swept into the purported class.

A rigorous analysis of the facts and claims, as prescribed by Rule 23 of the Federal Rules of Civil Procedure, proves that a purported class consisting of all HTGT customers cannot possibly meet the Civil Rule 23 class certification prerequisites.  Among the many obstacles to certification of the proposed class the following:

- Plaintiff has failed to define an identifiable and unambiguous class. The purported class encompasses an overbroad universe of "all customers," without regard to (i) the customer's exposure to, or reliance upon, HTGT's advertising, or (ii) the customer's own course of treatment and amount or degree of hair removal.

1

- Certification of Plaintiff's Ohio Consumer Sales Practices Act claim is precluded by *Marrone v. Philip Morris USA*, 110 Ohio St.3d 5, 2006-Ohio-2869.

- LaManna cannot prove the claims she alleges in her complaint, since she did not see, hear, or rely upon any HTGT advertisements.

- Questions of both fact and law differ dramatically among HTGT customers because the purported class spans eight years, six states, and two FDA approvals of the Epilight device.  The claims are predicated upon a customer's own exposure to and reliance upon HTGT's advertising, and ultimately the claims depend upon any given customer's own individual hair removal results.

Plaintiff's class action claims thus boil down to the notion that HTGT customers do not experience the outcome – *i.e.*, the removal of unwanted hair – that HTGT purportedly said they would.  The evidence however establishes that HTGT has always disclosed to its customers that individual hair removal results would vary depending on a variety of individualized circumstances, including a customer's physical traits, frequency of treatment, and other factors. Given (i) the variability of any customer's hair removal results, combined with both (ii) the intensely personal circumstances involving the removal of unwanted hair from various locations of the body and (iii) the personal and purely subjective "cosmetic" considerations involving the removal of unwanted hair, Plaintiff cannot establish that class certification would be an appropriate method of adjudicating the claim, if any, of any HTGT customer.

Plaintiff's assertion of an "all customers" class action does nothing more than involuntarily put HTGT's customers, including legions of satisfied customers, in the position of publicly airing their intimate personal affairs relating to their treatments to remove unwanted hair.  How else, though, could Plaintiff prove, or HTGT defend, the allegation that HTGT committed consumer or common-law fraud regarding any particular customer's hair removal treatments?

2

## II.     STATEMENT OF RELEVANT FACTS.

The record facts establish the insurmountable obstacles to class certification.

### A.     LAMANNA'S INTRODUCTION TO HTGT.

In December 1999, at the age of twenty-two, LaManna decided to seek treatment in order to remove unwanted hair from her back and abdomen.[1]  LaManna read a magazine advertisement that promoted the Soft Light hair removal service.[2]  LaManna contacted Soft Light and learned that Soft Light was about to cease its operations.  (LaManna Tr. p. 14)

> Q:     Okay. When did you learn about Hair Today?
>
> A:     It must have been 1999 or just before.
>
> Q:     What did you learn about it?
>
> A:     Actually I saw an article in a magazine for - - and it wasn't called Hair Today, Gone Tomorrow.  It was called Soft Light and they have gone out of business, but were turning into this better modern Hair Today, Gone Tomorrow machine.  (LaManna Tr. p. 14)

Plaintiff testified that she was referred to HTGT but is unsure how she learned about HTGT or how she came to contact HTGT.

> Q:     Now, how did you learn that Hair Today was in Toledo?
>
> A:     Getting the number and calling.
>
> Q:     That's my point. Where did you get the number?
>
> A:     It could have been Soft Light.  I'm really not sure.
>
> Q:     You can't recall.
>
> A:     No.  (LaManna Tr. p. 15)

Importantly, Plaintiff did **not** learn about HTGT via its advertisements in the newspapers, via radio, or via mass marketing.  (LaManna Tr. p. 15)

---

[1] Deposition transcript of Renee LaManna (Feb. 24, 2004) ("LaManna Tr."), p. 11, 14, marked Exhibit A.

3

## B.    HTGT IS NOT AFFILIATED WITH SOFT LIGHT.

HTGT and Donald Tietz, an owner of HTGT, had nothing to do with Soft Light.[3] In fact, Soft Light utilized a machine that is completely different than the Epilight device used by HTGT.[4] In May 1998, HTGT began its operations and purchased its first Epilight machine from ESC Medical Systems, Ltd. ("ESC").[5] In 1999, HTGT established its salon in Toledo, Ohio.[6] HTGT exclusively uses the Epilight machine for HTGT's hair removal services.[7]

## C.    THE EPILIGHT DEVICE.

In 1997, the Food and Drug Administration ("FDA") approved the Epilight Hair Removal System to be used for the removal of unwanted hair.[8] ESC described the Epilight Hair Removal System as an "electro-optical medical device designed for effective photothermal treatment of unwanted hair and its long term removal."[9] In January 2000, the FDA re-approved the Epilight device for the permanent reduction of hair.[10] The treatment is described as follows:

> EpiLight is also intended to effect stable Long-term, or permanent hair reduction in skin types I-V through selective targeting of melanin in hair follicles.
>
> **Permanent hair reduction is defined as a long-term stable reduction in the number of hairs regrowing after a treatment regime**.  (Exhibit E, p. 5) (emphasis added)

The Epilight device produces a flash or a pulse of light via a wand that the operator (referred to as a "technologist") scans over the selected body location.[11] "The Epilight

---

[2] LaManna Tr. p. 14.
[3] Affidavit of Don Tietz (Nov. 13, 2006) ("Tietz Aff."), ¶ 5, marked Exhibit B.
[4] Tietz Aff. ¶¶ 7-9.
[5] Deposition of Donald Tietz (Aug. 9, 2006), ("Tietz Tr."), p. 69, marked Exhibit C.
[6] Tietz Aff. ¶ 22.
[7] Tietz Tr. p. 16-17.
[8] 510(K) Summary of Safety and Effectiveness, K963249, p. 5, marked Exhibit D.
[9] Exhibit D, p. 1.
[10] 510(K) Summary of Safety and Effectiveness, K991935, marked Exhibit E.
[11] Deposition Transcript of Kathleen Markocki (Aug. 30, 2006) ("Markocki Tr."), p. 19, marked Exhibit F; Jeffrey Hunt, DO, Joel Schlessinger, MD, Thomas Woo, MD, *Treatment of Large Body Areas with Epilight Hair Removal System: Multi-Center Back Epilation*, 2 CLINICAL APPLICATION NOTES 2, marked Exhibit G.

Hair Removal System uses a noncoherent light source operating on a broad band wavelength spectrum," and further includes a variety of flexible parameters that permits a customized treatment according to the individual customer's needs.  (Exhibit G)  In any treatment, the technologist applies a layer of gel to the target location to cool the skin and to improve (or "couple") the light delivery to the skin.  (Exhibit H, p. 378)  Depending on the circumstances, the technologist may manipulate the intensity of the light pulse through various ways, including adjusting the intensity or duration of the pulse or increasing the gel layer to the location.[12]

Pulse energy and pulse duration are critical factors in the selective photothermolysis of hair follicles.[13]  The hair's independent growth cycle, which varies from one part of the body to another, also impacts the effectiveness of the light-based hair removal.[14]  The results of an Epilight treatment vary among customers based on skin tone, hair color, and area from which hair is removed.[15]

The published literature confirms the efficacy of HTGT's light-related hair removal process.  Drs. Gold and Bell found:

> The intense pulsed light system is a safe and effective method to achieve long-term hair removal.  Our continued 1-year evaluation, and reports presented by other authors, help support these clinical observations.  Our study of one treatment with the intense pulsed light source yielded a 75% hair reduction after 1 year.

\*   \*   \*

---

Defendant Kathleen Markocki is HTGT's Technologist Manager.  (Markocki Tr. p. 9)  Although Ms. Markocki testified that she was **unable** to provide "a scientific understanding" of the Epilight process or results, she nonetheless provided a "lay person's understanding" of her personal observations. (Markocki Tr. p. 20-21) Plaintiff thereafter presented Ms. Markocki's lay opinion as scientific fact. (Doc. 37, p. 3)  Ms. Markocki lacks the training and experience of an expert witness on the scientific or medical issues of the Epilight device or body hair.  Fed. R. Evid. 702; *Daubert v. Merrill-Dow Pharm., Inc.*, 509 U.S. 579 (1993).

[12] Markocki Tr. p. 19; Exhibit H.

[13] Yardy Tse, MD, *Hair Removal Using a Pulsed-Intense Light Source*, 17 HAIR RESTORATION & LASER HAIR REMOVAL 2 (Apr. 1999)(p. 375), marked Exhibit H.

[14] Exhibit H, p. 378.

[15] Tietz Tr. p. 15; Exhibits G-H.

> Most experts in the hair removal arena agree that multiple treatment sessions may yield an even greater percentage of long-term hair removal . . .[16]

Dr. Christian Raulin reported effective results of the intense pulse light systems, including Epilight, after one treatment, including the increased hair reduction or clearance rates after a multiple treatment regime and follow up treatments.[17]

In summary, the epidemiological evidence, including the peer review articles and FDA approval documents, establish that the Epilight treatment permanently reduces unwanted hair. (Exhibits D, E, G-J)  The research establishes that the intense pulse light application initially eliminates some hair and, over time and multiple treatments, the hair removal results improve.[18]  Plaintiff has not elicited a shred of expert or scientific evidence to the contrary.

### D. HTGT'S HAIR REMOVAL SERVICES.

HTGT's technologists meet with customers for one-on-one consultations prior to any hair removal treatment.  (Markocki Tr. p. 36-38)  All HTGT technicians complete a 160-hour training course and thereafter receive a certificate of completion.[19]  ESC approved HTGT's training program as an independent certification course.  (Tietz Aff. ¶ 21) At the time of Plaintiff's treatment, Ohio did not mandate a special license to operate the Epilight machine.[20]

Not all potential customers are suitable for Epilight treatment, and among suitable customers there can be a range of hair loss results.[21]  In short, the Epilight results vary:

---

[16] Michael Gold, MD, Michael Bell, MD, Teresa Foster, RN, and Sherri Street CCE, *One-Year Follow-Up Using An Intense Pulsed Light Source For Long-Term Hair Removal*, 1 J. CUTANEOUS LASER THERAPY 1999, 167-171, marked Exhibit I.
[17] Christian Raulin, MD, Barbel Greve, MD, Hortensia Grema, MD, *IPL Technology: A Review*, 32 LASERS IN SURGERY & MED. 78-87 (2003), marked Exhibit J.
[18] Exhibits G-J, D, E.
[19] Tietz Tr. p. 32; Markocki Tr. p. 45.
[20] The Ohio Administrative Code regulating the use of the light pulse devise became effective after Plaintiff's last treatment in June 2000.  (Ohio Adm. Code § 4731-18-03 (effective date June 30, 2000)).
[21] Tietz Tr. p. 15.

Q:    For some of your customers the hair is eliminated and for
      some it is not?

A:    Correct

Q:    Is that something you can determine with a given customer
      prior to treatment?

A:    No.  (Tietz Tr. p. 15)

HTGT generally recommends an initial treatment course of one year,[22] although
the actual recommended treatment course is tailored to each customer.[23] A typical range of
Epilight treatments for a customer's initial year will be anywhere from six to twelve treatments.[24]
HTGT further offers a maintenance program after the initial treatment course that is custom
tailored to each customer.  (Tietz Tr. p. 20)

HTGT's collective knowledge and experience indicates that the technology
works.  (Tietz Tr. p. 75-76)  A long-time employee testified that HTGT's customers are satisfied
with the treatment results:

Q:    Do you know of any **customers who are satisfied with the
      level of hair removal - -**

A.    **Yes.**

Q.    **- - or reduction or elimination or whatever word you
      would want to use?**

A.    **Yes.**  (Markocki Tr. p. 49-51) (emphasis added)

It is undisputed that HTGT has satisfied customers, including customers whose
actual testimonials (taken from customer surveys) are used by HTGT in its advertising.[25]  The
purported class, however, encompasses all HTGT customers and therefore improperly includes
satisfied customers who have no claim against HTGT.

---

[22] Tietz Tr. p. 17.
[23] Markocki Tr. p. 49.
[24] Tietz Tr. p. 17.

7

### E.    HTGT'S INFORMED CONSENT.

HTGT's informed consent form expressly provides that "[p]hoto-therapy treatment involves the use of intense light and while it is effective in most cases, no guarantee is made that a particular client will benefit from the treatment."[26]  HTGT's informed consent further provides as follows:

> The purpose of this treatment is to eliminate unwanted hair.
>
> I understand that the **results of treatment with the EPILIGHT system may vary with different skin types, hair color and location**.  Based on experience with thousands of clients and discussion with many physicians we have found that people who tend to sunburn rather than tan, usually obtain good results on the first and subsequent visits.  On the other hand, those who tan more easily tend to have more variation in their results.  (LaManna's Informed Consent, p. 1) (emphasis added)

HTGT's informed consent form notes the various risks, discomforts, and complications associated with the intense light procedures.[27]  The informed consent form also informs the potential customer that there are "several alternative treatments of hair removal, including electrolysis, plucking, waxing and shaving."   (LaManna's Informed Consent, p. 2)

### F.    HTGT'S ADVERTISING.

HTGT has marketed its hair removal services via print and radio advertisements.[28]  HTGT also maintains a website, which was revised in 2003.[29]  Typically, HTGT's advertisement provides the potential customer with general information about the pulse light treatment, the HTGT salon, possible results, appointments, and client testimonials.[30]  HTGT's slogans include "hair removal is all we do"; "just remove it"; and "Quick, effective, painless – permanently

---

[25] Tietz Aff. ¶¶ 17-18.
[26] HTGT's Informed Consent, signed by Renee LaManna (Dec. 17, 1999) ("LaManna's Informed Consent"), p. 1, marked Exhibit K (emphasis added).
[27] LaManna's Informed Consent, p. 1-2.
[28] Tietz Tr. p. 57.
[29] Tietz Tr. p. 53.  HTGT abandoned its television efforts within a limited time in 2000 or 2001.  Tietz Tr. p. 46-47.

reduce unwanted hair today!"[31]  HTGT's toll-free telephone number is 877-No-Hairs.[32]  As HTGT grew and provided services to additional customers, HTGT developed and continues to revise its advertisements to reflect its service and customers.  (Tietz Tr. p. 46-49)

Within the first 18 months of its first salon, HTGT distributed the ESC brochure in HTGT's salons because HTGT had not yet created its own materials.[33]  After the initial 18 month period, HTGT developed its own brochure.[34]  HTGT's original brochure explained HTGT's services and provided general information about light-based hair removal.[35]  HTGT's first brochure indicated that the Epilight treatment was (i) customized according to skin type, skin color, hair type and texture; and (ii) was unlike temporary hair removal procedures such as shaving, waxing, or electrolysis.  (Tietz Aff. ¶¶ 12-18, Exs. 2-6)

## G.  PLAINTIFF'S HTGT TREATMENTS.

LaManna attended an initial consult session in Toledo in December 1999, at which time HTGT provided Plaintiff with an ESC brochure.[36]  Plaintiff testified that HTGT's Toledo office appeared to be a spa.  (LaManna Tr. p. 17, "It's a spa looking place.")

On December 17, 1999, Plaintiff signed the HTGT informed consent form and negotiated pre-paid packages for Epilight treatments on her back and abdomen.[37]  Plaintiff paid for four treatments for each area and received a one-year, free maintenance program.[38]  LaManna expressly acknowledged:

---

[30] Tietz Aff. ¶¶ 12-18, Exs. 2-6.
[31] Tietz Aff. ¶¶ 12-18, Exs. 2-6.
[32] Tietz Aff. ¶¶ 12-18, Exs. 2-6.
[33] Tietz Tr. p. 64-65.  ESC Brochure, marked Exhibit L.
[34] Tietz Aff. ¶¶ 10-12.
[35] Tietz Aff. ¶¶ 12-18, Exs. 2-6.
[36] HTGT file for Renee LaManna, marked Exhibit M; Doc. 44, ¶ 6, Ex. 1; Tietz Aff. ¶¶ 11-12.
[37] LaManna's Informed Consent.
[38] LaManna's Informed Consent.

The purpose of this treatment is to eliminate unwanted hair.

I understand that the **results of treatment with the EPILIGHT system may vary with different skin types, hair color and location**.  Based on experience with thousands of clients and discussion with many physicians we have found that people who tend to sunburn rather than tan, usually obtain good results on the first and subsequent visits.  On the other hand, those who tan more easily tend to have more variation in their results.  (LaManna's Informed Consent, p. 1) (emphasis added)

Plaintiff thereafter initiated her treatments which occurred on the following dates:

| | |
|---|---|
| December 17, 1999: | Toledo Office |
| February 9, 2000: | Toledo Office |
| March 11, 2000: | Toledo Office |
| April 22, 2000: | Toledo Office |
| June 15, 2000: | Cleveland Office  (Exhibit M) |

LaManna asserts that the December 1999 and February 2000 treatments did not remove the unwanted hair on her back and abdomen.[39]  At the March 2000 treatment, Plaintiff reported to the HTGT technologist, "[h]air is still there and I'm not baby soft like I want to be."[40] Plaintiff admitted, however, that she did not realize she had the free, one-year maintenance option.  "I was under the impression that I paid for four treatments, but I was informed in Parma that I can go as many times as I want.  I wasn't aware of that."[41]

By the April 2000 treatment, Plaintiff perceived that there was not "much hair loss but [there was] slower and finer growth."  (LaManna Tr. p. 28)  On June 15, 2000, Plaintiff attended her fifth treatment, at which point she claimed that she had little hair loss.  (Exhibit M) The HTGT technologist adjusted the setting and filter of the Epilight machine before Plaintiff's

---

[39] LaManna Tr. p. 22, 23, 26.
[40] LaManna Tr. p. 27.
[41] LaManna Tr. p. 27.

treatment.  (Exhibit M)  The technologist also advised LaManna to schedule additional treatments as soon as possible if she did not have hair loss within two weeks.  (Exhibit M)

The next entry in LaManna's file is dated September 9, 2000, at which time the HTGT technologist refused Plaintiff's treatment because of hyperpigmentation to Plaintiff's back and abdomen.[42]  Plaintiff nonetheless later returned for treatment, because she "felt that [the hair condition] was better than what it was and . . . maybe [the technician] could treat her."[43] LaManna also informed the HTGT technologist that she had consulted a physician and was applying a bleaching cream to the hyperpigmented area.[44]  Plaintiff would later claim that she was burned at the June 15, 2000 treatment and that the hyperpigmentation was a result of the burn.[45]

On March 9, 2001, Plaintiff again attempted treatment, but then refused the treatment after a test on her abdomen.  (Exhibit M)  LaManna did not receive an actual treatment at that time.[46]  In October 2001, Plaintiff met with the HTGT technician to provide photos of Plaintiff's back and abdomen.  (Exhibit M)

## III.    PLAINTIFF'S CLAIMS AGAINST HTGT.

On June 14, 2002, Plaintiff filed a personal injury action in state court against HTGT and others.[47]  On April 21, 2003, Plaintiff filed an amended complaint alleging class claims in addition to her personal injury claims.[48]  On November 1, 2005, Plaintiff dismissed her suit.  Then, on March 6, 2006, Plaintiff refiled her claims in the United States District Court.

---

[42] Exhibit M; LaManna Tr. p. 32-33.  In general terms, hyperpigmentation is an increased pigment of the skin.
[43] LaManna Tr. p. 33.
[44] Exhibit M; LaManna Tr. p. 31.
[45] Doc. 1; LaManna Tr. p. 30.
[46] Exhibit M; LaManna Tr. p. 34.
[47] Complaints, case no. 02CV473005, in the Cuyahoga County Court of Common Pleas ("State action"), marked Exhibit N; see also http://cpdocket.cp.cuyahogacounty.us/p_CV_Docket.
[48] State Action.

(Doc. 1)  On September 15, 2006, Plaintiff filed a proposed Amended Complaint and a Motion for Class Certification.  (Doc. 37)

In the Amended Complaint, Plaintiff sets forth newly asserted claims of fraudulent misrepresentation and fraudulent nondisclosure, together with claims under the consumer protection laws of six different states.  LaManna's amended claims, however, all relate to the Epilight service and whether it worked.  In particular, LaManna alleges in her latest Complaint that this class action is based on the "performance of a service" – *i.e.*, the Epilight Treatments.  (Doc. 47, ¶1)  Plaintiff claims that "in fact only a small percentage of customers actually had all their unwanted hair eliminated."  (Doc. 37, p. 25)

Plaintiff cannot possibly identify among HTGT's 25,000 customers those customers whose treatments were successful either by objective "measurement" or by subjective customer satisfaction.  Instead, Plaintiff sweeps "all customers" into a purported class, which would require this Court to somehow distinguish between them on a customer-by-customer basis.  Plaintiff's claims highlight the abject failure to support her claims with anything other than her own peculiar experience and the blurred contention that for an unascertained number of HTGT's customers, the treatments might have "reduced" but not "eliminated" the unwanted hair.

LaManna further alleges, based on her own unique set of experiences in 1999, that the Defendants "imply [that] their expertise, skill and knowledge is that of doctors, dermatologists or cosmetic surgeons"[49] and that HTGT creates "an impression of a medical or scientific professionalism," because its employees are "outfitted with white lab coats." (Doc. 47, ¶ 22)  LaManna asserts in her brief that HTGT "dresses up its services to make them appear quasi-medical."  (Doc. 37, p. 3)  Putting aside the fact that LaManna testified that the HTGT

---

[49] Doc. 47, ¶ 21.

facility appeared to be a "spa" (and therefore not a medical office),[50] the Complaint does nothing more than raise the subjective state-of-mind "impressions" of 25,000 separate HTGT's customers, all of whom had different experiences with different HTGT employees at different times, at different salons, involving varied courses of treatment, and with different results.

Plaintiff's class certification argument is centered on HTGT's advertisements, which argument completely ignores the point that the claims ultimately turn on the (individualized) results of the treatments. That is, the ads for the hair removal treatments did not in and of themselves, cause anyone any cognizable harm or damage, since a customer who saw the advertisement and relied upon it, and who thereafter commenced satisfactory hair removal treatments, would *not* have any claim. Nor would a customer who understood (based on HTGT's express disclaimer) that the individual results of the hair removal treatments would vary among customers.

Just as important, LaManna continues to pursue her own personal injury claims for negligence, recklessness and battery, seeking compensatory and punitive damages. Although Plaintiff purports in her Complaint to seek "compensatory damages on behalf of Plaintiff and the Class members,"[51] LaManna asserts in her class certification brief that she instead "seeks rescission of the full amount ... paid [to HTGT]." (Doc. 37, p. 1) Plaintiff asserts that the rescission claim is predicated upon an "election of remedies" on behalf of the absent class members, even for her claim pursuant to R.C. 1345.09(B). (Doc. 37, p. 28)

---

[50] LaManna Tr. p. 17.
[51] Doc. 47, Prayer (B).

## IV.      THIS COURT SHOULD DENY THE MOTION FOR CLASS CERTIFICATION.

As set forth below, Plaintiff's purported "all customer" class cannot be certified.

### A.      THE RULE 23 STANDARDS.

Pursuant to Rule 23(a), four requirements must be met before certifying a class:

> (1) the class is so **numerous** that joinder of all members is impracticable, (2) there are questions of law or fact **common** to the class, (3) the claims or defenses of the representative parties are **typical** of the claims or defenses of the class, and (4) the representative parties will fairly and **adequately** protect the interests of the class.  (Emphasis added)

In addition to the requirements of Rule 23(a), the plaintiff must establish the Rule

23(b)(3) prerequisites:

> An action may be maintained as a class action if the prerequisites of subdivision (A) are satisfied, and in addition:
>
> *      *      *
>
> (3) the court finds that the questions of law or fact common to the members of the class **predominate** over any questions affecting only individual members, and that a class action is **superior** to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action.  (Emphasis added)

Plaintiff bears the burden of proving that all of the prerequisites to class

certification have been established.  *Chamberlain v. American Tobacco Co., Inc.*, 1:96CV2005,

1999 U.S. Dist. LEXIS 5843 (N.D. Ohio Apr. 12, 1999) (J. Gaughan) (*citing In re American

Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996) ("*AMS*"); *Hoang v. E\*Trade Group, Inc.*, 151

Ohio App. 3d 363, 2003-Ohio-301, ¶14; ("The party seeking to maintain a class action has the

burden of demonstrating that all factual and legal prerequisites to class certification have been met."). If the putative class representative cannot meet every one of the requirements of Rule 23(a) and (b) then class certification must be denied. *Wilson v. Brush Wellman, Inc.*, 103 Ohio St. 3d 538, 2004-Ohio-5847, ¶5. In the case of a proposed class under Civil Rule 23(b)(3), the movant must demonstrate that common questions of law or fact predominate, and that a class action would be superior to other methods for the adjudication of the controversy. *See, e.g., Warner v. Waste Mgt., Inc.*, 36 Ohio St.3d 95, 521 N.E. 2d 1091 (1988).

In conjunction with Plaintiff's burden, a trial court "is required to carefully apply the class action requirements and conduct a rigorous analysis into whether the prerequisites of Civ. R. 23 have been satisfied." *Chamberlain*, 1999 U.S. Dist. LEXIS 5843 (*citing General Tel. Co. v. Falcon*, 457 U.S. 147 (1982)); *See also Repede v. Nunes*, 2006-Ohio-4117, ¶10, 2006 App. LEXIS 4062 (quotations omitted). Such a rigorous analysis includes an examination of the "legal or factual questions that qualify each class member's case as a genuine controversy." *Repede*, 2006-Ohio-4117, ¶13 (citations omitted).

Although the court cannot *decide* the substantive merits of a claim on a motion for class certification, the court "may go beyond the pleadings to the extent necessary to understand the claims, defense, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Chamberlain*, 1999 U.S. Dist. LEXIS 5843, *11. In other words, the courts must "probe behind the pleadings" to determine whether Rule 23 is satisfied. *Id.*, 1999 U.S. Dist. LEXIS 5843, *11 ("the court may examine depositions, affidavits and expert reports in determining whether class certification is appropriate").[52]

---

[52] Plaintiff's suggestion that it would be "inappropriate to inquire into the merits of the action at the class certification stage" (Doc. 37, p. 7) grossly misstates the governing principle of law. As part of a rigorous analysis, this Court should inquire into the merits at the class certification stage. This Court should not, however, adjudicate the substantive merits of the named plaintiff's claim.

As part of a rigorous analysis of the Rule 23 requirements, the district court "should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Chaz Concrete Co., LLC v. Codell*, No. 3:03-52-KKC, 2006 U.S. Dist. LEXIS 60013 (E.D. Ky. Aug. 23, 2006) (*quoting Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 477 (S.D. Ohio 2004)). A purported class is impermissibly overbroad if, as here, it includes members who have not suffered any harm. *Chaz Concrete*, 2006 U.S. Dist. LEXIS 60013. ("A properly defined class includes only members who would have standing to bring suit in their own right.")

Plaintiff seeks to certify a so-called Rule 23(b)(3) damages class consisting of all HTGT customers. Plaintiff's purported class is defined as follows:

> All persons who purchased and received hair removal treatments provided by the Defendant HTGT in salons located in the states of Ohio, Illinois, Michigan, Indiana, Kentucky, and Wisconsin from 1998 to present.

This Court should deny the Motion for Class Certification because LaManna's dissatisfaction with HTGT's Epilight treatment is personal, and her claims, if any, are unique to her. LaManna – and every other customer of HTGT – was specifically cautioned that hair removal results would vary from customer to customer. It follows, then, that a universe of "all customers" includes legions of satisfied HTGT customers. Not only do the satisfied customers have no claim whatsoever against HTGT, but it is not apparent that any other customer would have any claim either. What, for instance, would be the claim of a customer who simply failed to complete his or her course of treatment? And what would be the claim of a customer who understood that individual results vary, but nonetheless elected to proceed with the treatments? Similarly, what would be the claim of a customer who is personally satisfied with the treatments? Many, like LaManna, may not have viewed or relied upon any HTGT advertisement and would

therefore have no basis for an "advertising" claim.  The point is that *every* HTGT customer is different, and any claim of any customer turns on highly individualized facts.  In the end, every claim of every HTGT customer relating to HTGT's services ultimately would depend upon that particular customer's own hair removal results and his or her subjective viewpoint about the cosmetic results of such treatment, none of which can be determined on a "class-wide" basis.

**B.**  **PLAINTIFF'S OHIO CONSUMER SALES PRACTICES ACT CLASS CANNOT BE CERTIFIED.**

As an initial matter of law, a class asserting a claim under the Ohio Consumer Sales Practices Act ("CSPA") cannot be certified.  In *Marrone v. Philip Morris USA*, the Supreme Court of Ohio held that a consumer may assert a class action claim under the CSPA *only if* the alleged violation "is substantially similar to an act or practice previously declared to be deceptive [either by an Ohio Administrative Code rule adopted by the Attorney General of Ohio or a court decision made available for public inspection by the Attorney General of Ohio]." 110 Ohio St.3d 5, 2006-Ohio-2869.  Pursuant to R.C. 1345.09(B), a CSPA class action requires that the "supplier" act "in the face of prior notice that its conduct was deceptive or unconscionable."  2006-Ohio-2869, ¶9.  The *Marrone* court held that a "generic" decision or rule, or one that involves a different industry or different conduct, does not "provide meaningful notice of specific acts or practices" that violate the CSPA.  *Id.* at ¶21.  Pursuant to *Marrone*, **"[p]rior notice may be in the form of an act or practice determined by a court of this state to violate section 1324.02 or 1345.03 of the Revised Code and * * * made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code."**[53]

---

[53] R.C. § 1345.09(B); *Marrone*, 2006-Ohio-2869, at ¶13 (quotations omitted)(emphasis added).  R.C. 1345.05(A)(3) provides that the Attorney General must make available for public inspection all rules * * * together with all judgments, including supporting opinions, by courts of this state * * * determining that specific acts or practices violate section 1345.02 or 1345.03 of the Revised Code.  Id., at ¶14.

A review of the Ohio Attorney General's Online Public Inspection File, located on the internet at www.opif.ag.state.oh.us, indicates no case, rule, or opinion relative to HTGT, the light pulse technology industry, or the hair removal industry. Absent any specific determination applicable to HTGT, class certification of the CSPA claim is precluded as a matter of law.

Ignoring the crystal clear rule established in *Marrone*, Plaintiff instead asserts that a 1988 administrative decision of the Federal Trade Commission ("FTC") regarding a radio frequency energy tweezers device created the required notice under Ohio law.[54]  Since the sound wave/tweezers device is altogether different from Epilight's light pulse machine, the FTC's decision does not constitute notice to HTGT.  *Marrone*, 2006-Ohio-2869, syllabus ("Cases that involve industries and conduct very different from the defendant's do not provide meaningful notice of specific acts or practices that violate the CSPA.").  In any event, the Ohio Attorney General has not posted the FTC order in the Ohio Public Inspection File.[55]

## C.    THIS COURT CANNOT CERTIFY A "FRAUD ON THE FDA" CLAIM.

Plaintiff's claims are predicated on her view about the ultimate effectiveness of the Epilight device, which allegation is nothing more than "fraud-on-the-FDA" claim precluded by the Federal Food Drug and Cosmetic Act, 52 Stat. 1040, as amended by the MDA of 1976, 90 Stat. 539.  *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, syllabus (2001) ("The relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law.")  The FDA alone has authority to regulate the Epilight device, and Plaintiff's claims are an

---

[54] *FTC v. Removatron Intl. Corp.*, 111 FTC 206 (1988), aff'd, 884 F.2d 1489 (11th Cir. 1989), modified, 114 FTC 715 (1991)(withdrew the desist order)(emphasis added).
[55] Putting aside the prohibition against any class under the CSPA, Plaintiff cannot assert any claim against HTGT under the consumer protection laws of Illinois, Michigan, Indiana, Kentucky or Wisconsin.

effort to regulate the device indirectly through litigation. This Court should not certify any class that, as here, reflects an improper attempt at indirect regulation.

### D. PLAINTIFF CANNOT ESTABLISH THE CLASS CERTIFICATION PREREQUISITES.

#### 1. The Purported Class Is Overbroad and Ambiguous.

Any proposed class at a minimum must (i) specify a particular group that was harmed during a particular time frame, in a particular location, in a particular way, and (ii) facilitate a court's ability to ascertain class membership in some objective manner. *Chaz Concrete*, 2006 U.S. Dist. LEXIS 60013, *13. *Accord*:

> [T]here must be alleged at the minimum (1) a reasonably defined class of plaintiffs, (2) all of whom have suffered a constitutional or statutory violation (3) inflicted by the defendants.

*Adashunas v. Negley*, 626 F.2d 600, 603 (7th Cir. 1980), *see also Denny v. Deutsche Bank*, 443 F.3d 253, 254 (2nd Cir. 2006) (refusing to certify class that included groups "who have not suffered or are not likely to suffer an injury-in-fact,"); *O'Neill v. Gourmet Sys.*, 219 F.R.D. 445, 451 (W.D. Wis. 2002) (certification failed since "[p]laintiff's claim is overly broad because it includes an untold number of persons who are at no risk of suffering the injury about which plaintiff complains.")

Plaintiff's purported "all customers" class cannot meet this minimum requirement because the class definition neither specifies a particular group of HTGT customers that supposedly was damaged, nor does it facilitate the identification of such a group in any objective way. The proposed class instead encompasses **all HTGT customers** from 1998 to the present, including a large but unascertainable number of customers who are satisfied with their hair removal treatments and who therefore have not suffered *any* harm or damage. Therefore,

contrary to Plaintiff's statement,[56] members of the class cannot be identified "through HTGT's computerized records." HTGT's computerized records reflect its *customers*, but do not identify which, if any, of those customers may have a claim against HTGT. In *Petty v. Wal-Mart Stores, Inc.*, an Ohio court rejected class certification in part on the ground that the class was unidentifiable since the court lacked an administratively feasible method of determining potential class members without conducting individualized adjudications of an "all employee" class. 148 Ohio App.3d 348, 2002-Ohio-1211.

It is well-settled under Ohio's virtually identical Civil Rule 23 counterpart that a court cannot certify an overbroad class that (as here) includes individuals who have no claim. *See, e.g., Repede*, 2006-Ohio-4117, ¶¶19-20 (reversing trial court's certification of a class encompassing individuals who had no claim); *Hoang v. E\*Trade*, 151 Ohio App. 3d 363, ¶26 (reversing decision granting class certification where some class members had not been harmed and "liability as to each individual plaintiff's claims cannot be ascertained on a class-wide basis in a single adjudication"); *Lynn v. Roto-Rooter*, 2004-Ohio-2559, ¶23-24, 2004 Ohio App. LEXIS 2274 (reversing decision granting certification because there was "no evidence that all class members have suffered some harm to which common questions of law or fact apply"). *Barber v. Meister Protection Serv.*, Cuyahoga App. No. 81553, 2003-Ohio-1520, ¶37 (reversing class certification because "all customer" class was too broadly defined since it included customers who "undoubtedly are satisfied with their service.").

The purported class is also ambiguous and overbroad because it encompasses all HTGT customers irrespective of whether a particular customer ever saw, heard or read (or for that matter relied upon) a particular HTGT advertisement. Even among the unidentified group of HTGT customers who did, the class indiscriminately lumps together customers who saw

---

[56] Doc. 37, p. 9.

different ads. Each customer's exposure, if any, to HTGT's advertising differs by time, content and media, to say nothing of the questions of whether a particular customer actually relied upon any statement. *See Chaz Concrete*, 2006 U.S. Dist. LEXIS 60013, *13.

In this regard, even that unascertainable number of HTGT customers who did see or hear HTGT advertisements may have noted other aspects of the hair removal treatments, such the FDA approval, the fact that it presented an alternative to other hair removal methods, the relative safety, comfort associated with the Epilight treatments, the free maintenance treatments, or the flexible hours for appointments. Plaintiff has not raised any issue with any of these statements. Of course, Plaintiff cannot say what aspect, if any, of any HTGT advertisement may have been material to any given customer.

### 2.    Plaintiff Lacks Standing and Is Not a Member of the Purported Class.

A prerequisite of every class action is "that the class representatives . . . be members of the class." *Warner v. Waste Mgt.*, 36 Ohio St. 3d at 96; *see also Howland v. Purdue Pharma L.P.*, 104 Ohio St. 3d 584, 2004-Ohio-6552, ¶18. This is tantamount to the threshold requirement of standing:

> The standing inquiry is part and parcel of the requirement that the representative is a member of the class he seeks to represent . . . That a suit may be a class action . . . adds nothing to the concept of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other unidentified members of the class to which they belong and which they purport to represent.

*Woods v. Oak Hill Cmty. Med. Ctr., Inc.*, 134 Ohio App. 3d 261, 268-69, 730 N.E. 2d 1037 (4th Dist. 1999) (internal citations omitted). "A plaintiff may not use the procedural device of a class action to boot strap himself into standing he lacks under the express terms of the substantive law." *Paoletti v. Travelers Indem. Co.*, No. 1-75-196, 1977 Ohio App. LEXIS 10181, at *7-8 (6th Dist. May 6, 1977).

LaManna's own peculiar facts preclude her from ever proving the "class" claims she has alleged. LaManna testified she neither saw nor relied upon HTGT's ads (LaManna Tr. P. 16), refuting her allegation that "HTGT's deceptive and misleading representations made in its marketing campaigns in fact were common to the entire class." (Doc. 37, p. 15; Doc. 44). Thus, LaManna lacks standing to pursue the advertising claims alleged in her Complaint. *See White v. Best Buy Co., Inc.*, Cuyahoga County C.P. No. CV-99-387161, vol. 3166, pg. 0161 (Aug. 5, 2004) (in a consumer action that alleges deceptive advertising, the class could not be certified because the named plaintiff did not see, let alone rely on, the advertisement at issue in the lawsuit; therefore, the trial court granted summary judgment on plaintiff's claims in defendant's favor) (certified copy of the Order attached).

### 3. Plaintiff Cannot Establish the Commonality and Predominance Prerequisites.

The Rule 23(a)(2) "commonality" and (b)(3) "predominance" prerequisites are related. *Amchem Prods., Inc. v. Windsor*, 83 F.3d 610, 627 (3rd Cir. 1996) (test of commonality is "subsumed" by the predominance requirement), aff'd, 521 U.S. 591 (1997). The "commonality" prerequisite looks to whether there is a "common nucleus of operative facts." *Warner v. Waste Mgt.*, 36 Ohio St. 3d at 97. Where claims turn on individualized, plaintiff-specific issues of reliance, causation, and damages, commonality is lacking. *Chamberlain*, 1999 U.S. Dist. LEXIS 5843 at *24 (*citing AMS*, 75 F.3d 1069).

The Rule 23(b)(3) predominance prerequisite is a heightened requirement that "focuses on the legal and factual questions that qualify each class member's case as a genuine controversy." *Repede*, 2006-Ohio-4117, ¶13. To satisfy the predominance prerequisite, "the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication." *Schmidt v. Avco Corp.*, 15 Ohio

St. 3d 310, 313, 473 N.E. 2d 832 (1984); *see also State ex rel. Davis v. Public Emps. Ret. Bd.*, 111 Ohio St.3d 118, 2006-Ohio-5339, ¶28 (for class certification, common questions must be "capable of resolution for all members in a single adjudication."). "The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Jones v. Allercare, Inc.*, 203 F.R.D. 290, 303 (N.D. Ohio 2001) (J. Gaughan) (*quoting Amchem*, 521 U.S. at 623). Predominance fails where "[l]iability … turns on individual determinations." *Howland v. Purdue Pharma*, 2004-Ohio-6552, ¶¶22-23; *Chamberlain*, 1999 U.S. Dist. LEXIS 5842, *48-52 (no predominance where the case turns on individual issues).

Plaintiff's claims turn on highly individualized issues of reliance, causation and damages, to say nothing of the problems associated with applying the various elements of the statutory and common laws of six different states. In fact, to determine whether a given HTGT customer even has a claim and thus could be found to have membership in any "class," this Court would be required to conduct as many as 25,000 individual mini-trials to determine:

1. Customer's body part(s) treated.

2. Date(s) and location(s) of treatment(s).

3. Package of bundled treatment(s) purchased, including initial treatment(s) and maintenance program(s).

4. Skin tone, hair color and other personal issues.

5. Whether a customer ever saw or heard a HTGT ad and, if so, (i) the specific ad(s), (ii) the customer's reliance on the ad(s), and (iii) the reasonableness of such reliance.

6. Personal understanding of the Epilight treatment.

7. Personal understanding of the terms "reduce", "eliminate", "remove", "hair free", "1-877-NO HAIRS", as well as "certified technician."

8. Execution and understanding of informed consent form.

9. Personal hair removal results.

10.    Customer's subjective satisfaction with hair removal treatments.

The evidence shows that LaManna's course of treatment, like that of every other HTGT customer, was customized to her skin tone, hair type as well as her target body locations. (Exhibit M)  LaManna's unusual hyperpigmentation issue interfered with her course of treatment and maintenance program, preventing her from completing one year of treatment.  These circumstances, which are unique to LaManna, only highlight that there is no "formula" upon which this Court, on an aggregate and across-the-board basis, could identify class members, ascertain which, if any, of them have claims, and then determine liability, causation and damage.[57]

Class certification should be denied where, as here, liability cannot be decided in the aggregate without the particularized proof of *cause* and *damage* concerning each plaintiff. *Kohn v. American Hous. Found., Inc.*, 178 F.R.D. 536 (Colo. 1998) (nursing home resident class failed because liability issues were personal to the individual residents and the residents' individual differences precluded the typicality requirement). Plaintiff's claim is really nothing more than a misguided play on semantics, *i.e.*, the difference, if any, between the "elimination" of unwanted hair versus the "reduction" of it.

However, what constitutes the "removal," "reduction," or "elimination" of "unwanted hair" and the difference between those terms, falls far short of establishing any common question.  Indeed, the terms "eliminate" and "permanently reduce" can mean the same thing to a customer since that which is "reduced" in fact is eliminated.  Regardless of the

---

[57] Plaintiff asserts that the "apportionment of damages" is insufficient to defeat class certification where such an apportionment is made pursuant to "standardized formulas."  (Doc. 37, pp. 13, 21).  This case, of course, does not involve such an apportionment by standardized formulas.  Instead, the class of "all customers" involves a customer-by-customer determination of "fact of damage," since among the purported class of "all customers" are a large and otherwise unascertainable number of customers who have not suffered any harm or damage as a result of the HTGT treatments.  For purposes of class certification, courts distinguish between "fact of damage" and "amount (or

meaning or interpretation of the terms, the case does not turn on advertisements, but rather the customer's actual hair removal result as well as the customer's subjective view about the treatments. After all, the difference, if any, between "eliminate" and "reduce," which seems to be the focus of Plaintiff's claims, ultimately depends on the *results* of the treatments. The hair removal results, of course, vary among the customers depending on a number of individualized factors. To make matters worse, there is only way to measure the results is to literally expose customers to an intrusive, customer-by-customer inquiry as to those results.

### a.  Questions of Individual Reliance Preclude Class Certification.

*Marrone* precludes certification of the CSPA claim. *See supra*, III. B. LaManna's remaining claim for fraudulent misrepresentation and nondisclosure fails because of individualized questions of reliance. Plaintiff acknowledges that class certification could not be appropriate where an "individual assessment" would be required. (Doc. 37, p. 19). In *Castano v. American Tobacco Co.*, the court plainly held that "a fraud class action cannot be certified when individual reliance will be an issue." 84 F.3d 734, 745 (5th Cir. 1996).

Plaintiff's misrepresentation claim is predicated, in part, on a customer's purported reliance on HTGT's advertisements. However, class certification is further precluded because there is no way to determine, absent customer-by-customer mini-trials, whether any particular customer reasonably relied on anything that HTGT said. *See, e.g., Marks v. C.P. Chemical Co., Inc.*, 31 Ohio St. 3d 200, 206, 509 N.E. 2d 1249 (1987) (predominance fails where "an individual determination would have to be made in every case as to what the purchaser read or was told . . . as well as the individual's reliance on those representations when making the decision to buy"); *Roto-Rooter*, 2004-Ohio-2559 (different representations presented

_____

apportionment) of damage," the former being a barrier to class certification. *Denny v. Deutsche Bank*, 443 F.3d at 254 (regarding injury-in-fact).

individualized inquiries related to fraud claims); *Sprague v. General Motors Corp.*, 133 F.3d 388, 397-98 (6th Cir. 1998)(class certification not appropriate where class members would have to testify individually about the alleged oral misrepresentations); *Hoang v. E\*Trade*, 2003-Ohio-301, ¶25-28 ("the issues relating to liability with respect to each individual plaintiff's claims make it impossible to prove or disprove the claims of all the members of the class on a simultaneous, class-wide basis").

In fact, HTGT's advertisements have conveyed slightly different messages at different times, thereby interjecting differences among the universe of customers who saw or heard the ads. (Tietz Aff., ¶ 14-18). In this way, Plaintiff's suggestion that HTGT's use of the word "elimination" of unwanted hair gives rise to a claim because the unwanted hair is only "reduced" conversely shows that HTGT's later advertising that used the word "reduced" would not give rise to any claim. (*See* Doc. 37, p. 24 (suggesting that the word "elimination" gives rise to claims because the treatment "merely provides for hair reduction")). By Plaintiff's own admission then, her theory of the case would turn on the specific advertisement that any particular customer saw, and thereby not only would it preclude an "all customers" class but it would also interject differences based on who saw what ad.

Furthermore, LaManna does not have any claim relating to HTGT's advertising since she did not see, hear or read HTGT's advertisements. (LaManna Tr. p. 14-15) Although Plaintiff vaguely references a "uniform" marketing campaign, the evidence establishes that LaManna was not exposed to it. Moreover, HTGT's marketing materials have all been revised since 1999 when LaManna initially contacted HTGT.[58]

Plaintiff also alleges in her Complaint that HTGT omitted material information, specifically that the HTGT technologists were not certified by the Ohio Board of Medicine or

were not permitted to perform the Epilight treatment. (Doc. 47, ¶ 29) This allegation highlights the individual nature of the claim, since LaManna testified that she likened the HTGT facility to a spa, not a medical facility. (LaManna Tr. p. 17) Any other customer's perception would have to be ascertained based on that particular customer's experience. Finally, there is no legal support for the proposition that the technologists had to be certified by the Ohio Board of Medicine or licensed by a state agency to provide the treatment to Plaintiff in 1999. Yet the fact that various states that currently regulate the use of light pulse devices creates additional factual differences and militates against class certification.

### b.    This Court Should Not Certify a Multi-State Class.

Plaintiff's purported "multi-state" class is brought on behalf of HTGT customers in six states dating back to 1998. Due to the application of multiple and conflicting laws of the various states, common questions of law and fact, if any, are overwhelmed by the necessary application of six different consumer protection statutes, statutes of limitations, damages measures, affirmative defenses, and additional state-specific rules and regulations.

To begin with, LaManna has no claim under the consumer protection laws of Illinois, Michigan, Indiana, Kentucky or Wisconsin. Even if she could pursue such claims, compelling reasons advise against certifying a class that consists of six separate sub-classes that would require the Court to instruct on, and the jury to somehow distinguish among and apply, six different and sometimes conflicting sets of laws. It is well-established that "[i]n a multi-state class action, variations in state law may swamp any common issues and defeat predominance." *Castano*, 84 F.3d at 741 (*citing Georgine v. Amchem Prods.*, 88 F.3d 610 (3rd Cir. 1996); *AMS*, 75 F.3d at 1085).

---

[58] LaManna Tr. p. 14-15; Tietz Tr. p. 46-47, 53, 57, 64-65; Tietz Aff. ¶¶ 12-18, Exs. 2-6; Doc. 44.

Moreover, there are significant differences among the various states' common-law fraud elements (*e.g.*, scienter, duty to disclose, justifiable reliance, statutes of limitations) that preclude certification of a multi-state common-law fraud claim. Plaintiff has done almost nothing to identify the differences in laws of the six states, let alone propose a workable trial plan to accommodate such differences. For this reason alone, this Court should deny class certification. *Stirman v. Exxon*, 280 F.3d 554, 563-66 (5th Cir. 2002) (reversing class certification because the plaintiff had not demonstrated that the relevant state laws were uniform); *In re Jackson Nat'l Life Ins. Co. Premium Lit.*, 183 F.R.D. 217, 222-224 (W.D. Mich. 1998) (denying class certification because of variations in state law).

Highlighting the difficulty of applying varying statutes of limitations to different claims arising under different states laws, consider that under the CSPA, the statute of limitations would not apply to any claim (of any Ohio customers) that arises before April 21, 2001 (based on the initial class action complaint filed April 21, 2003).[59] Given the recent assertion of a fraud claim, the statute of limitations would extinguish any such claim arising even later in time. Thus, a class consisting of customers of HTGT from its inception in 1998, as Plaintiff proposes, would include a large group of individuals who would have no claim under any legal theory. This analysis only highlights the enormous difficulties in trying to apply different statutes of limitations applicable to different legal theories arising under six different states' laws to different customers, and the customer-by-customer findings that would thereby be required.

LaManna's punitive damages claim further destroys any predominance. Plaintiff's superficial analysis fails to consider the vast state-by-state differences in the law of punitive damages, such as differing and unsettled standards of scienter, burdens of proof, damage caps, *etc. See, e.g., In re Northern Dist. of Calif., Dalkon Shield IUD Prods. Liab. Litig.*, 693

F.2d 847 (9th Cir. 1982) (declining to certify nationwide class action because states do not apply the same punitive damages standards).

c.    **The "Rescission" Claim Does Not Establish the "Predominance" Prerequisite.**

Putting aside the fact that LaManna is not entitled to assert any class action claim under R.C. Chapter 1345 and therefore cannot base a rescission claim on the statute,[60] Plaintiff has no basis whatsoever to "elect" the remedy of rescission on behalf of the absent class members.  In the first place, customers who experienced satisfactory hair removal results from their treatments would not be entitled to their money back.  *Denny v. Deutsche Bank*, 443 F.3d at 254 (regarding injury-in-fact).  On the opposite side of the coin, a customer, such as LaManna, who alleges personal injury resulting from the treatments would not "elect" rescission because (as LaManna herself claims) the alleged damages may exceed the amount paid to HTGT. LaManna cannot identify which, if any, customers would not elect rescission because their alleged damages might exceed the modest cost of the treatments. Plaintiff therefore has no basis whatsoever to "elect" for any customer, let alone all of them, any remedy.  Because the hair removal treatments – and the results of those treatments – varied among HTGT customers, Plaintiff cannot universally elect a rescission claim for no other reason than to try to avoid the class-defeating differences among them.

LaManna certainly has not cited any authority to support the notion that by electing a rescission claim, a plaintiff can thereby avoid the differences among members of an "all customers" class.  This lack of authority is particularly glaring in the context of this case – *i.e.*, where the rescission claim is directed to individualized *services that already have been received* by the class members.  However, even the "election" of a rescission claim cannot avoid

---

[59] The CSPA sets forth a strict two-year statute of limitations pursuant to R.C. § 1345.10.

29

the necessity of separate inquiries into whether any customer/class member received a benefit from the treatments.

### 4. LaManna's Claims Are Not Typical Of The Claims Of The Proposed Class.

Rule 23(a)(3) requires a putative class representative to show "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  In *Sprague v. General Motors Corp.*, the court held as follows:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.  133 F.3d at 399

In other words, "[a] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *General Tel. Co. v. Falcon*, 457 U.S. at 157.

Where, as here, a purported class representative asserts claims of fraud based on the plaintiff's own personal understanding of certain representations, typicality is destroyed. *See, e.g., Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000) (no typicality where plaintiffs' claims rested on their understanding of the transaction and terms or where the purchase package differed among purported class members).  In such a case, the reliance and the reasonableness of the reliance of each of the plaintiffs/class members precludes any class-wide proceeding. *Bradberry v. John Hancock Mut. Life Ins. Co.*, 222 F.R.D. 568 (W.D. Tenn. 2004).

Plaintiff bases her claims on the ESC brochure or the oral statements of HTGT's technologists at LaManna's 1999 consultation, not on HTGT's advertising.  Because Plaintiff cannot "connect the dots" between any HTGT advertisement and any resulting harm or damage, her claim (if any) is not typical of any other customer who asserts a claim based on HTGT's advertising.  Typicality is also lacking because LaManna cannot establish that the HTGT

---

[60] *See Marrone, supra.*  Additionally, R.C. 1345.09(B) does not provide that rescission is available in a class action.

treatments failed for any other customer simply because they failed for her.  In this regard, HTGT told its customers that the results of HTGT's hair removal treatments varied from customer to customer based on a given customer's personal traits and individual circumstances.[61]

### 5.    Plaintiff Is Not an Adequate Class Representative.

A plaintiff seeking to represent the class must demonstrate that he or she will fairly and adequately represent and protect the interests of the class.  *AMS*, 75 F.3d at 1083.  The Sixth Circuit has held that "[i]nterests are antagonistic when there is evidence that the representative plaintiffs appear unable to "vigorously prosecute the interests of the class."  *Stout v. J.D. Byrider*, 228 F.3d at 717 (*quoting AMS*, 75 F.3d 1069).  Thus,

> [t]he adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members.  *Chaz Concrete*, 2006 U.S. Dist. LEXIS 60013 *21 (*quoting AMS,* 75 F.3d at 1083).

Plaintiff's personal claims demonstrate the absolute conflict between her claims and the purported class claims.  Plaintiff has alleged personal claims for negligence, recklessness, and battery, and further seeks to recover on her own account compensatory and punitive damages separate from the class.  (Doc. 47, Counts III, IV, E-G).  LaManna's battery claim (for which she seeks compensatory and punitive damages) is predicated on the same allegations (HTGT's alleged misrepresentations and omissions) for which LaManna has "elected" rescission on behalf of the absent class members.  Thus, LaManna is not an adequate class representative because there is an inherent and irreconcilable conflict between her personal claims and the alleged advertising claims of the purported class.

---

[61] Plaintiff suggests that there is a "prima facia" case that a customer was exposed to HTGT's advertising. (Doc 37, p. 15).  While HTGT disputes that there can be any "presumption" or "prima facie" case that would preclude HTGT's defense as to any HTGT customer, LaManna's testimony as the named plaintiff/class representative that she did not see or hear HTGT's advertisement conclusively precludes any such "prima facie" case.

31

### 6.     A Class Action Is Not A Superior Means To Adjudicate Plaintiff's Claims.

The Rule 23(b)(3) "superiority" prerequisite looks to whether there would be greater "economy, efficiency, and ease of handling" in a class action, as opposed to individual lawsuits. *AMS*, 75 F.3d at 1085 (finding superiority prerequisite not met when the individualized claims, applied to the multi-state law of negligence create for the district court an "insurmountable burden."). A class action is "superior" *only if* proceeding on a class-wide basis would *simplify* the resolution of complex litigation.

Plaintiff has not established the superiority prerequisite. First and foremost, Plaintiff has not established how these claims, which concern the personalized hair removal services HTGT's customers received, can be tried on an aggregate, class-wide basis. In addition to all of the individualized questions about the hair removal treatments and the related questions of whether there is any damage proximately resulting from such treatments, and if so the amount such damage, Plaintiff's purported class is really comprised of six or more state law-based sub-classes. As a result, the claims, if any, of the customers in each sub-class would have to be determined based on different (and conflicting) laws.

For example, the jury would be forced to apply and distinguish among (and the Court forced to instruct as to) different laws applicable to different HTGT customers including: determine on a customer-by-customer basis when each one of the various claims accrued and when the limitations period on each of those claims would have run; apply different "discovery" rules and other exceptions to different statutes of limitations; apply varying concepts of intent or scienter; apply varying concepts of comparative fault; apply different measures of compensatory and punitive damages; and differentiate among customers based upon a host of additional elements of the claims and defenses under any state's statutory and common law. The jury, thus,

32

could be required to answer well over 100,000 interrogatories to adjudicate the claims of 25,000 different customers whose claims (if any) arose at different times and under different laws, who had different experiences with different personnel at different HTGT salons, who saw or read different ads (if any), who had different treatment outcomes, and who claim different damages (if any).

Under the circumstances of this case, class certification is not superior because it would impose an insurmountable burden on the Court and the jury to separately adjudicate different claims. Such an undertaking would present a grave risk of fundamental unfairness and prejudice to HTGT.

A class action is also not superior because of the intrusive and involuntary nature of the claims. HTGT is entitled to defend itself, and class certification cannot take away HTGT's defenses. One of HTGT's defenses is that its hair removal treatments removed or reduced unwanted hair. Because individual treatment results vary, Plaintiff's claims – and HTGT's defenses – ultimately depend on the hair removal results experienced by each HTGT customer. Given the extremely private nature of the hair removal treatments, a HTGT customer would be better served by filing his or her own claim if a customer had reason to believe that HTGT engaged in any wrongdoing, as opposed to involuntarily subjecting all HTGT customers to the burden of individually proving claims that Plaintiff cannot even say exist in the first place.

## V.     CONCLUSION.

Unlike the case where a Chevy engine is put into a Cadillac vehicle, Plaintiff's claims involve professional "*services*" -- services that are tailored to individual customers, and the results of which naturally vary among those customers.  Further confounding any class-wide treatment, the actual hair removal treatments involve purely subjective considerations of "cosmetics" and "beauty."  Because there is no "formula" to determine on an across-the-board basis for all HTGT customers whether a given customer (i) saw a HTGT advertisement, (ii) reasonably relied on such advertisement, (iii) the hair removal results of that customer, and (iv) the customer's own level of satisfaction with such hair removal treatments, any attempt to try the claims as a class action would require each class member to individually prove his or her case. Not only would that process defeat the very purpose of a class action, there are compelling reasons to avoid obligating HTGT's customers to such a personally intrusive proof.

For the foregoing reasons, this Court should deny the Motion for Class Certification as a matter of law.

Respectfully submitted,

s/Kate E. Ryan
Murray K. Lenson (0021928)
Kate E. Ryan (0068248)
ULMER & BERNE LLP
Skylight Office Tower
1660 West 2nd Street – Suite 1100
Cleveland, Ohio  44113-1448
Telephone: (216) 583-7000
Facsimile: (216) 583-7001
mlenson@ulmer.com
kryan@ulmer.com

Attorneys for Defendants Hair Today, Gone Tomorrow, LLC and Donald Tietz

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1

I certify that the foregoing Reply Brief complies with the page limitation requirements set forth in L.R. 7.1(f), as modified by the Court's Order dated October 4, 2006, enlarging the page limitation relating to dispositive motions.  The foregoing Reply Brief, including this Certification page has 35 pages.

s/Kate E. Ryan
Kate E. Ryan (0068248)

One of the Attorneys for Defendants Hair Today, Gone Tomorrow, LLC and Hair Today, Gone Tomorrow

## CERTIFICATE OF SERVICE

I hereby certify that on November 14, 2006, the foregoing Defendants HTGT and Don Tietz's Memorandum in Opposition to Motion for Class Certification was electronically filed.  Notice of this filing will be sent to counsel of record for all parties by operation of the Court's Electronic Case Filing system.

s/Kate E. Ryan
Kate E. Ryan (0068248)

One of the Attorneys for Defendants Hair Today, Gone Tomorrow, LLC and Hair Today, Gone Tomorrow

1599233