**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| **Renee Lemanna Faralli,** | ) | **CASE NO.  1: 06 CV 504** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **Hair Today, Gone Tomorrow, et al.,** | ) | **<u>Memorandum of Opinion and Order</u>** |
| | ) | |
| **Defendant.** | ) | |


<u>**Introduction**</u>

This matter is before the Court upon plaintiff's Motion for Class Certification (Doc.

36)[1].  In this action, plaintiff asserts that Hair Today Gone Tomorrow engaged in a

coordinated fraudulent marketing campaign which represented to plaintiff and other potential

class members that unwanted hair could be eliminated when in fact it could only be reduced.

For the following reasons, the motion is DENIED.

<u>**Facts**</u>

On March 6, 2006, plaintiff, Renee Lemanna Faralli, filed her Class Action

---

[1]    This Opinion also resolves Document Nos. 61 and 63, discussed *infra.*

1

Complaint[2] against defendants, Hair Today Gone Tomorrow, L.L.C., Hair Today, Gone Tomorrow (hereafter, HTGT)[3], Don Tietz, Karen Kasberg, Kathleen Markocki and Heidi A. Dunphy. The Complaint alleges that the class consists of all persons living in Ohio, Illinois, Michigan, Indiana, Kentucky and Wisconsin who purchased Epilight treatments from defendants from 1994 to the present and sets forth class claims for unjust enrichment, recission, violation of consumer sales practices act and violation of deceptive trade practices. On September 15, 2006, plaintiff sought leave to file her First Amended Class Action Complaint. Leave was granted and the First Amended Class Action Complaint sets forth four claims. Counts One and Two assert class action claims of fraudulent misrepresentation and fraudulent nondisclosure[4], and violation of consumer fraud acts. Counts Three and Four assert individual claims of negligence/recklessness and battery.

Plaintiff's First Amended Class Action Complaint alleges that HTGT is in the business of providing a service purporting to remove or reduce body hair. Tietz is the president of HTGT. Markocki is its national director. The service used by HTGT employs the operation of an electric modality known as Epilight treatments. Defendants engaged in a marketing scheme to sell the Epilight treatments to the public which consisted of deceptive,

---

[2]     This is a refiled case. In June 2002, plaintiff filed a personal injury action in state court against Hair Today Gone Tomorrow and other defendants. In April 2003, plaintiff filed an amended complaint alleging class claims in addition to her personal injury claims.

[3]     Plaintiff asserts that although Hair Today Gone Tomorrow, L.L.C. and Hair Today, Gone Tomorrow are both named as defendants in the First Amended Complaint, discovery has demonstrated that there is only one defendant, Hair Today, Gone Tomorrow.

[4]     The claims for fraudulent misrepresentation and fraudulent nondisclosure were first asserted in the First Amended Class Action Complaint.

2

misleading and false representations that the Epilight treatments would result in permanent hair removal, result in long-term hair removal, and would result in the elimination of unwanted hair.  Defendants, however, had knowledge that the purpose of the Epilight device was to reduce unwanted hair, and not permanently remove it.  Defendants also falsely represented that the people who would perform the Epilight treatments were certified by Ohio's Board of Medicine and/or were allowed by law to perform the treatments, by use of the words "Certified Technologist."  Plaintiff was induced by these false representations to consent to the Epilight treatments and was damaged thereby.

The parties submit the following evidentiary facts.

HTGT, which was formed in 1998, does business in five states (Ohio, Michigan, Illinois, Wisconsin and Indiana). HTGT uses the Epilight treatment on its customers.  (Tietz depo. 16, 52, 56) In 1998, HTGT purchased its first Epilight machine from ESC Medical Systems, Ltd. (ESC), the manufacturer of Epilight.  (Tietz aff.)  The Epilight Hair Removal System was approved by the Food and Drug Administration in 1997 to be used for the removal of unwanted hair.  (Doc. 56 Ex. D) In January 2000, the FDA re-approved the Epilight device for the permanent reduction of hair.  (*Id.* Ex. E)

According to published literature submitted by defendants[5], the results of an Epilight treatment vary among customers based on skin tone, hair color and area from which hair is removed.  (Doc. 56 Ex. H) Literature published in 1999 concluded that

---

[5]     Plaintiff has filed a Motion to Strike these documents as unauthenticated (Doc. 61).  The motion is denied for the reasons stated in the brief in opposition.  In any event, consideration of these documents does not affect the outcome of this Court's decision.

> The intense pulsed light system is a safe and effective method to achieve long-term hair removal.  Our continued 1-year evaluation, and reports presented by other authors, help support these clinical observations.  Our study of one treatment with the intense pulsed light source yielded a 75% hair reduction after one year.
> ***
> Most experts in the hair removal arena agree that multiple treatment sessions may yield an even greater percentage of long-term hair removal...

(*Id.* Ex. I) Literature published in 2003 reported effective results of the intense pulse light systems, including Epilight, following several treatments.  (*Id.* Ex. J)

HTGT's Technologist Training Manual states that the Epilight "is a pigment seeking pulsed light" which seeks out the hair follicle and damages it, resulting in the hair naturally falling out within one to four weeks. (Doc. 37 Ex. 10) According to Kathleen Markocki, the Epilight device emits a flash of light which can result in singing of the hair, damage to the hair follicle and/or reddening of the skin.  HTGT recommends a course of treatments, followed by maintenance treatments to address existing hair, which may be new hair or regrowth of hairs. The goal is "to see hair loss."  Hair is not eliminated or completely removed in a given area.  (Markocki depo. 19-25) Tietz testified that HTGT is permitted to advertise only for reduction, not permanent hair removal.  (Tietz depo. 21)

Tietz testified that for some of HTGT's customers, the hair is eliminated and for some it is not, and the success cannot be determined prior to treatment.  Generally, HTGT recommends an initial course of treatments of one year, consisting of 6-12 treatments, with maintenance programs to follow.  (Tietz depo. 15, 17) Marcocki testified that she has knowledge of customers who are satisfied with the level of hair removal, elimination, or reduction. (Marcocki depo. 50)

Plaintiff points out that HTGT's website states that its light-based hair removal system

4

is "specifically designed to eliminate unwanted hair" and that  HTGT's phone number is 1-877-NO-HAIRS.  (Doc. 37 Ex. 3) HTGT's radio advertisements include a woman stating that after treating with HTGT, "it's all gone."  (Doc. 37 Ex. 4) HTGT spends approximately $1,000,000.00 in radio advertisements annually. (Tietz depo. 50-51) HTGT's brochure states, "It is impossible to eliminate all the troubling hair in one session, so [HTGT] offers a package that can be tailored to meet your individual requirements."  (Doc. 37 Ex. 7)

Tietz avers that in 1998 and 1999, HTGT used the ESC-created brochure for all in-salon consultations regarding the Epilight science and treatments.  HTGT produced its original brochure after using the ESC brochure for 1 ½ years.  A second, revised version of the brochure produced by HTGT, contains the following change in verbiage:

**first version**

In only a few flashes of light, undesired hair is effectively *eliminated*.  We are so confident in our results, that we offer a hair free maintenance program. (emphasis added)

**revised version**

In only a few flashes of light, undesired hair is effectively *reduced*.  We are so confident in our results, that we offer a hair free maintenance program. (emphasis added)

(Tietz aff.)

Plaintiff asserts that the following evidence shows that HTGT attempts to have its services appear quasi-medical.  While the services provided by HTGT are cosmetic and not medical, HTGT refers to its employees as "certified technologists."  The certification is a result of in-house training only. The technologists dress in white smocks, sometimes known as lab coats. The technologists take a "medical history" when customers first come into the

5

store.  (Tietz depo. 16, 28, 31-32, 39, 43) Customers sign an "informed consent" document.

(Doc. 37 Ex. 8)

HTGT technologists meet with customers for a consultation prior to treatment.

(Marcocki depo. 36-38) All technicians complete a 160 hour training course, then receive a

certificate of completion.  (Tietz depo. 32; Marcocki depo. 45) At the time of plaintiff's

treatment, Ohio did not mandate a special licence to operate the Epilight machine.  *See* Ohio

Administrative Code § 4731-18-03.

In 1999, plaintiff decided to seek treatment to remove unwanted hair on her back and

abdomen. Plaintiff testified that she was unsure of how she first learned about HTGT:

Q.  Okay.  When did you learn about [HTGT]?

A.  It must have been 1999 or just before.

Q.  What did you learn about [HTGT]?

A.  Actually I saw an article in a magazine for- and it wasn't called Hair Today, Gone
Tomorrow.  It was called Soft Light and they have gone out of business, but were
turning into this better modern Hair Today, Gone Tomorrow machine.[6]

Q.  All right.  So your first contact with this concept was about the machine that was
being used to remove hair, is that essentially correct?

A.  How do you mean?

Q.  Well, you said about Soft Light?

A.  Yes.

Q.  The Soft Light is a machine?

---

[6]     Tietz avers that neither he nor HTGT have ever been associated with Soft Light or
its services.  (Tietz aff.)

6

A.  Yes, I would guess it is a machine.

Q.  And that's what you read about in a magazine?

A.  Yes.

Q.  All right.  And what did you determine from that article?

A.  That I feel I have a problem that if I go to this place and have them use this machine on me, it would eliminate my problem.

Q.  Well, did the article advertise Hair Today?

A.  For the Soft Light?

Q.  Yes.

A.  No.

Q.  Okay.  So how did you first learn how to get to [HTGT]?

A.  If I remember correctly, they said that over the phone or whatever that they were no longer going to be in business, but this product was coming out.

***

Q.  Now, how did you learn that [HTGT] was in Toledo?

A.  Getting the phone number and calling.

Q.  That's my point.  Where did you get the number?

A.  It could have been Soft Light.  I'm really not sure.

Q.  You can't recall?

A.  No.

(pltf. depo. 11-16)

Plaintiff first attended a consultation with HTGT in Toledo in December 1999, when she was provided with an ESC  brochure.  Plaintiff signed an Informed Consent provided by

7

HTGT which states in part that "Photo-therapy treatment involves the use of intense light and while it is effective in most cases, no guarantee is made that a particular client will benefit from the treatment."  (Doc. 56 Ex. K) This document further provides:

> The purpose of this treatment is to eliminate unwanted hair.
>
> I understand that the results of the treatment with the EPILIGHT system may vary with different skin types, hair color and location.  Based on experience with thousands of clients and discussion with many physicians we have found that people who tend to sunburn rather than tan, usually obtain good results on the first and subsequent visits. On the other hand, those who tan more easily tend to have more variation in their results.

(*Id.*)  At that time, plaintiff paid for four treatments and received a free one-year maintenance program.  (*Id.*)

Plaintiff thereafter began her treatments to her back and abdomen which occurred on the following dates: December 17, 1999, February 9, 2000, March 11, 2000, April 22, 2000 and June 15, 2000.  (Doc. 56 Ex. M)

Plaintiff testified that she was burned on her back and abdomen during the June 2000 treatment and consulted a doctor who told her to use a bleaching cream.  (pltf. depo. 30-31) Plaintiff returned on September 9, 2000, but HTGT refused treatment to her because of the hyperpigmentation to plaintiff's back and abdomen.  (Doc. 56 Ex. M; pltf. depo. 32-33) Plaintiff returned in March 2001 for treatment to her abdomen because she "felt that it was better than what it was and I went back to see if maybe she could treat me for that."  (pltf. depo. 33)  Plaintiff was again refused treatment.  (*Id.* 34; Doc. 56 Ex. M)

Plaintiff alleges that she was caused personal injury and harm as a result of these treatments and thereafter filed her Class Action Complaint.  Plaintiff seeks compensatory damages on her behalf and on behalf of the class members on Counts One and Two.  On

Count Two, plaintiff seeks recission of all contracts entered into by herself and the class.  On

Counts Three and Four, plaintiff seeks compensatory damages.  Finally, plaintiff seeks

punitive damages on all counts.

This matter is before the Court upon plaintiff's Motion for Class Certification.

Plaintiff's motion seeks class certification of her claims asserted in Counts One and Two, and

against defendants HTGT, Tietz and Markocki only. Defendants HTGT and Donald Tietz

have filed a brief opposing the motion.  Defendants Kathleen Marcocki, Karen Kasberg and

Heidi Dunphy have filed a statement that they join in the brief in opposition filed by HTGT

and Tietz.

### **Discussion**

Seven requirements must be satisfied before a case may be maintained as a class

action.  *Repede v. Nunes*, 2006 WL 2299853 (Ohio App. 8th  Dist. Aug. 10, 2006).  There are

two "implied" elements of Civil Rule 23: an identifiable class must exist and the definition of

the class must be unambiguous, and the named representative must be a member of the class.

Next, the party seeking certification of a class under Rule 23(a) must demonstrate that (1) the

class is so numerous that joinder of all members is impracticable, (2) there are questions of

law or fact common to the class, (3) the claims or defenses of the representative parties are

typical of the claims or defenses of the class, and (4) the representative parties will fairly and

adequately protect the interests of the class.  *Id.* (citing *Hamilton v. Ohio Sav. Bank*, 82 Ohio

St.3d 67 (1998) and *Rodney v. Northwest Airlines, Inc.*, 146 Fed.Appx. 783, 785 (6th Cir.

2005).  Finally, "In addition to the prerequisites of Rule 23(a), a party seeking class

certification must show that the class action is maintainable under Rule 23(b)."  *Id.*

9

Plaintiff argues that this action can be maintained under Rule 23(b)(3) which requires this Court to find

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

"Before certifying a class action, district courts must conduct a 'rigorous analysis' into whether the movant has demonstrated that the action satisfies all of the prerequisites of Federal Rule of Civil Procedure 23(a). " *Reeb v. Ohio Dept. of Rehabilitation and Correction*, 81 Fed.Appx. 550, 555 (6th Cir. 2003) (citations omitted)

The party seeking the class certification bears the burden of proof.  The court "may not inquire into the merits of the class representatives' underlying claims, but should accept the complaint's allegations as true." *Reeb*, 81 Fed.Appx. at 555 (citations omitted).  A court may look beyond the pleadings on a class certification motion to determine what type of evidence will be presented by the parties. *Rodney,* 146 Fed.Appx. at 785.

Plaintiff seeks to certify a class "of all persons who purchased and received Epilight treatments provided by [HTGT] salons located in the states of Ohio, Illinois, Michigan, Indiana, Kentucky and Wisconsin from 1998 to the present."  (Doc. 36 at 1)

**(1) ambiguity**

Defendants argue that the purported class is overly broad and ambiguous and, therefore, cannot be certified.  For the following reasons, this Court agrees.

10

As stated earlier, an identifiable class must exist. *See Warner v. Waste Management, Inc.*, 36 Ohio St.3d 91, 96 (1988) ("We note that Rule 23 requires, albeit implicitly, that an identifiable class must exist before certification is permissible. The definition of the class must be unambiguous.") *Mominey v. Union Escrow Co.*, 2003 WL 22510849 (Ohio App. 8th Dist. Nov. 6, 2003) ("The class must be identifiable and capable of unambiguous definition.) And,

> 'Before delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class.' *Bentley v. Honeywell International, Inc.*, 223 F.R.D. 471, 477 (S.D.Ohio 2004). Important elements of defining a class include: (1) specifying a particular group that was harmed during a particular time frame, in a particular location, in a particular way; and (2) facilitating a court's ability to ascertain its membership in some objective manner. *Id.*

*Chaz Concrete Co. v. Codell,* 2006 WL 2453302 (E.D. Ky. Aug. 23, 2006). Further, "A proposed class may be deemed overly broad if it would include members who have not suffered harm at the hands of the defendant and are not at risk to suffer such harm." *Id.* (citing *McGee v. East Ohio Gas Company,* 200 F.R.D. 382 (S.D. Ohio 2001).

Defendants assert that the proposed class herein is overly broad because the class definition neither specifies a particular group of HTGT customers that supposedly was damaged, nor does it facilitate the identification of such a group in any objective way. Rather, the proposed class encompasses all HTGT customers from 1998 to the present, including a large but unascertainable number of customers who are satisfied with their hair removal treatments and, consequently, have not suffered any harm or damage. Thus, while HTGT's computerized records may show its customers, the records do not identify those who may have a claim.

11

Additionally, defendants assert, the purported class is ambiguous and overly broad because it encompasses all HTGT customers regardless of whether a particular customer saw, heard, or read (or even relied upon) a particular HTGT advertisement.  And, even the unascertainable number of HTGT customers who did see or hear the advertisements may have noted other aspects of the hair removal treatments (such as the FDA approval, the fact that it presented an alternative to other hair removal methods, the relative safety, comfort associated with the Epilight treatments, or the flexible office hours for appointments) to which plaintiff has not raised any issue with.  Plaintiff cannot say what aspect, if any, of any HTGT advertisement may have been material to any given customer.

Plaintiff argues that a customer's satisfaction is not an issue at this stage in the litigation, but that the test is whether the means is specified at the time of certification to determine whether a particular individual is a member of the class.  Additionally, plaintiff contends that all potential class members were all commonly exposed to HTGT's fraudulent practices through the consultations with potential customers and in the consent form entered into by all customers which misrepresented that HTGT could eliminate unwanted hair.

Plaintiff relies on *Arndt v. P & M Ltd.,* 163 O.App..3d 179 (11th App. Dist. 2005), wherein the court stated, "The lower court's identification of a class consisting of all current residents of P & M Estates is not ambiguous merely because all the current residents of P & M Estates might not have suffered a compensable injury."  That case is distinguishable, however.  There, residents of P & M Estates, a manufactured home park, sought class certification on a complaint, filed in 2002, for injunctive relief and damages against the park owner for injunctive relief and damages arising from recurrent flooding allegedly caused by

12

statutory violations. The current residents sought to certify a class on behalf of all persons of P&M Estates who had resided there since 1992. P&M Estates argued that the class could not be certified because, at most, only 18 members of the proposed class had suffered any injury, i.e., physical damage to their homes. The court disagreed and noted that the basis for injunctive relief in the case was Ohio Revised Code's imposition of a duty on operators of manufactured home parks operators to, *inter alia,* keep all common areas of the park in a safe and sanitary condition, and to maintain all the water systems. The statute provided that residents may recover actual damages resulting from any violation and injunctive relief. Under these provisions, the court concluded, any resident affected by a park operator's failure to fulfill its statutory obligations had standing to seek injunctive relief. There was evidence that common areas of the park were affected by flooding which created public health issues that would be the concern of all park residents. Since all residents of the park had an interest in the maintenance of common areas, as well as the fit and habitable condition of the general premises, the court concluded that the class of all current residents of P & M Estates had standing to seek injunctive relief.

By contrast, the proposed class herein includes an unascertainable number of customers who have no claim because they have not suffered any harm or damage since they are satisfied with their hair removal treatments. Thus, this case is akin to those cases recognizing that a court cannot certify a class that includes individuals who have no claim.

In *Repede v. Nunes,* 2006 WL 2299853 (Ohio 8th App. Dist. Aug. 10, 2006), a customer brought a purported class action against a tax representation firm alleging claims of breach of contract, violation of the Ohio Consumer Sales Practices Act and deceptive

13

conduct.  The plaintiff sought class certification on behalf of all customers of the firm from a specified date on.  The appellate court determined that class certification was inappropriate because although plaintiff and some other members of the class may have suffered damages as a result of their dealings with the firm, others may not have suffered any damage at all. Extensive individualized inquiries would be necessary to distinguish between those who were injured and those who were not and, therefore, there was no predominance of common questions of law or fact.

In *Hoang v. E\*Trade Group, Inc.,* 151 Ohio App.3d 363 (8th App.Dist. 2003), the defendant offered customers online investing services. The plaintiff opened an account, which required that she sign a customer agreement. She filed a complaint for damages because of interruptions in service, contending that the service's representations of fast, accurate, and reliable service were false and inaccurate. She sought class certification of all Ohio residents who were customers during those interrupted periods. The appellate court determined that certification was inappropriate because some of the plaintiffs had suffered damages as a result of the interruptions while others had not. Some customers may not have been trading during any of the system interruptions, in which case they were not injured and had no claims. Customers that were trading may not have suffered any losses as a result of a system interruption, in which case they had no claims. Further, some customers who experienced the system interruptions may have actually benefitted from the interruption, in which case they had no claims.

Similarly, in *Barber v. Meister,* 2003 WL 1564320 (Ohio 8th App. Dist. March 27, 2003), class certification was not warranted where it included individuals who had not been

affected by the alleged illegal actions, and the proposed class was overly broad in that it included all individuals who purchased security systems from the company but who had no claim against the vendor defendants.

Plaintiff urges reliance on *Joseph v. General Motors Corporation,* 109 F.R.D. (D.Col. 1986), a 1986 Colorado district court opinion.  There, plaintiffs wished to certify a class consisting of all state residents who were current or former owners of 1981 Cadillacs equipped with a specific engine.  Plaintiffs and several potential class members submitted affidavits describing problems experienced with the operation of the engine. The court disagreed with defendant that the numerosity requirement could not be met despite the introduction of 11 affidavits of "satisfied customers" who had not experienced the problems. The court stated,

> Contrary to [defendant's] assertions, the fact that the class may initially include persons who have not had difficulties with their V8-6-4 engines or who do not wish to have these purported problems remedied is not important at this stage of the litigation, unless, of course, it is shown that most, if not all, of the potential class members have no claims to be asserted by the class representatives. In the instant case, plaintiffs have shown that there are at least 1,760 potential class members. Joinder of even this number would be impracticable. There is no evidence that most, or even all, of the potential class members have no claims against [defendant] and [defendant's] assertion of the existence of some 'satisfied customers' does not prove otherwise.

*Id.* at 639 (internal citations omitted)

As defendants point out, unlike the instance where an engine is put into a car, plaintiff's claims involve professional services which are tailored to individual customers whose results will naturally vary.  In that vein, there has been no evidence presented identifying who among the class of 25,000[7] was satisfied (or not satisfied) with the treatment.

---

[7]     This figure is identified by plaintiff in the numerosity section, below.

Nor does the class identify which customers fully completed a course of treatments with the maintenance follow-up treatments, as recommended by HTGT.  While plaintiff asserts that satisfaction is not an issue at this point but that the Court must consider that all potential class members were exposed to false representations, the end result of the treatment is critical to determining which customers suffered damage as a result of the false representation.  That is, those who suffered damage would be those who relied on the statement that the hair would be permanently reduced or eliminated, but in fact it was not.  Thus, because plaintiff's argument is focused on HTGT's advertisements, the claims ultimately center on results of the treatments.  A customer who saw an advertisement, relied upon it, commenced treatment and was ultimately satisfied would not have suffered damage and, consequently, would not have a claim.  Nor would a customer who understood HTGT's disclaimer that results vary with individual customers based on personal factors have a claim.

For these reasons, the definition of the class is ambiguous.

**(2) standing**

"The second implied prerequisite is that the class representatives must be members of the class." *Warner*, 36 Ohio St.3d at 96.  Defendants contend that plaintiff lacks standing and is not a member of the purported class.  Defendants point out that plaintiff testified that she was unsure as to how she learned about HTGT. Thus, she did not testify that she saw or relied on HTGT's ads and, consequently, lacks standing to pursue the advertising claims alleged in her Complaint.

Plaintiff submits a newly executed affidavit wherein she now avers, "I saw a newspaper advertisement in which Hair Today, Gone Tomorrow claimed it could eliminate

16

my unwanted hair."  (pltf.'s second aff. ¶ 4) An ad which plaintiff avers "is similar if not identical" to the one she saw is attached to the affidavit.  Plaintiff further avers, "After I saw the newspaper advertisement, I contacted a Hair Today, Gone Tomorrow Salon in Toledo, Ohio for the purpose of having my unwanted hair eliminated."  (*Id.*  ¶ 5) Plaintiff also points to her deposition testimony:

> Q.  Okay.  Now, why did you go to Toledo?
>
> A.  There wasn't one here and I was determined to have this problem taken care of.
>
> Q.  Okay.  What was the problem that you wanted taken care of?
>
> A.  Hair.  I have hair on me that I don't want there so.

(pltf. depo. 15).  Once at the salon, plaintiff asserts, she was provided with the brochure describing the Epilight device "specifically designed to eliminate undesired hair."  Following the misrepresentations, she entered into the contract to eliminate her unwanted hair.

Defendants have filed a Motion to Strike the affidavit (Doc. 63) on the basis that the affidavit directly contradicts plaintiff's prior testimony.  Nor, defendants assert, does the new affidavit explain why the new averments were not included in plaintiff's first affidavit.

As discussed in the factual section, above, plaintiff previously testified at deposition that she was unsure of how she first learned of HTGT when she first decided to seek hair removal treatment.  She testified that she saw an advertisement in a magazine for Soft Light, and that the advertisement did not advertise for HTGT.  She did not recall how she got the telephone number for the HTGT Toledo location.

Plaintiff asserts in her brief opposing the Motion to Strike that she was never asked at deposition whether she had *ever* seen a HTGT advertisement and she was under no obligation

17

to volunteer this information.  She also asserts that she indicated during discovery that while she could not identify the exact newspaper advertisement upon which she relied, she was prompted to seek HTGT's services based on the type of newspaper advertisement which plaintiff's attorneys provided to defendants in discovery.

Plaintiff's new affidavit appears to be an unfair attempt to now fill in the gap left in her deposition when questioned as to how she first learned of HTGT.  For this reason, the Motion to Strike is granted.  Nevertheless, even allowing plaintiff to introduce this new testimony to show standing, class certification is still not warranted because the purported class is overly broad, as discussed above, and for the various reasons discussed below.

### (3) numerosity

To prove numerosity, plaintiff

> must demonstrate that the putative class is 'so numerous that joinder of all members is impracticable.' Rule 23(a)(1). We have observed that there is no strict numerical test for determining impracticability of joinder.  Indeed, the numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations. Nevertheless, while the exact number of class members need not be pleaded or proved, impracticability of joinder must be positively shown, and cannot be speculative.

*Golden v. City of Columbus*, 404 F.3d 950, 965-966 (6th Cir. 2005) (citations omitted).

"When class size reaches substantial proportions, however, the impracticability requirement is usually satisfied by the numbers alone." *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Tietz testified that HTGT has treated over 25,000 people.  On this basis, plaintiff asserts that the numerosity element is satisfied.

Defendants do not dispute the numerosity element.

18

**(4) commonality and predominance**

The parties address these elements together.  It has been recognized that "the test of commonality is subsumed by the predominance requirement."  *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 627 (3rd Cir. 1996).  Defendants argue that plaintiff cannot establish the commonality and predominance prerequisites.  For the following reasons, this Court agrees.

"The Supreme Court has noted that class certification is appropriate when it is unlikely that differences in the factual background of each claim will affect the outcome of the legal issue."  *Bacon v. Honda of America Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004) (quoting *Califano v. Yamasaki* 442 U.S. 682, 701 (1979) ).  "Variations in the circumstances of class members are acceptable, as long as they have at least one issue in common."  *Id.* (citations omitted).  *See also Jones v. Allercare, Inc.,* 203 F.R.D. 290 (N.D. Ohio 2001)(citation omitted)  ("If there is a common issue of law or fact that will advance the litigation, the mere fact that questions peculiar to each individual member of the class remain after the common questions of defendants' liability have been resolved does not dictate the conclusion that a class action is impermissible.") The Sixth Circuit has explained:

> The commonality requirement deals with shared questions of law or fact. Although Rule 23(a)(2) speaks of "questions" in the plural, we have said that there need only be one question common to the class. It is not every common question that will suffice, however; at a sufficiently abstract level of generalization, almost any set of claims can be said to display commonality. What we are looking for is a common issue the resolution of which will advance the litigation.

*Sprague v. General Motors Corp.*, 133 F.3d 388, 397 (6th Cir.1998)  (citation omitted).

The predominance requirement

tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation. Rule 23(b)(3) assumes that common issues of fact or law have already been established under Rule 23(a)(2). Therefore, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). Instead, the predominance requirement focuses on the relationship between the common and individual issues.

All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other.. However, the individual differences must be of lesser overall significance and manageable in a single class action.

*Jones, surpa* (citations omitted). As recognized by the Ohio courts:

In an action for damages, the trial court must specifically find, pursuant to Civ.R. 23(B), that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Performing a 'rigorous analysis' of the Civ.R. 23(B)(3) predominance requirement necessitates an examination of 'common' versus 'individual' issues. A predominance inquiry is far more demanding than the Civ.R. 23(A) commonality requirement and focuses on the legal or factual questions that qualify each class member's case as a genuine controversy. Therefore, in determining whether common questions of law or fact predominate over individual issues, it is not sufficient that common questions merely exist; rather, the common questions must represent a significant aspect of the case and they must be able to be resolved for all members of the class in a single adjudication.

*Repede,* 2006 WL 2299853, *2- *3 (citations omitted).

Plaintiff contends that the commonality requirement is easily satisfied:

The central legal and factual issue in this case is whether HTGT misrepresented, misled and deceived the plaintiff and the class that the purpose of the Epilight treatments was to permanently eliminate unwanted hair. It was HTGT's policy and practice to market the Epilight treatments as an effective method to eliminate unwanted hair. It is even stated in the consent form, which the plaintiff and other potential class members signed, the purpose of the treatment is to 'eliminate unwanted hair.' These misrepresentations made both in advertising and on standardized documents, were uniform and common not only to the plaintiff but to the class as a whole.

(Doc. 37 at 13).

Plaintiff asserts that claims involving violations of consumer fraud acts generally

20

satisfy the predominance requirement.  Plaintiff states that the main issue herein is whether HTGT made deceptive, misleading and/or false representations in their advertisements, standardized forms and consultations regarding the permanency or efficiency of their hair removal service.  Thus, plaintiff contends, the evidence required to prove these allegations will apply to all class members and is not dependent upon circumstances unique to a particular class member.

 This Court, however, agrees with defendants' argument that plaintiff's claims involve highly individualized issues of reliance, causation and damages, further complicated by the necessity of applying the laws of six different states.  As discussed with regard to ambiguity, the end result of a customer's treatment is central in determining whether the customer suffered damage after relying on a false representation.  Defendants assert that to determine whether each HTGT customer has a claim warranting membership in the class, the Court would have to conduct up to 25,000 mini-trials to determine:

1. customer's body part(s) treated

2. date(s) and location(s) of treatment(s)

3. package of bundled treatment(s) purchased, including initial treatment(s) and maintenance program(s)

4. skin tone, hair color and other personal issues

5. whether a customer saw or heard a HTGT ad and, if so, identification of the ad and whether the customer reasonably relied on it

6. personal understanding of the Epilight treatment

7. personal understanding of the terms "reduce," "eliminate," "remove," "hair

21

free," "1-877-NO HAIRS," and "certified technician."

8.      execution and understanding of informed consent form

9.      personal hair removal results

10.     customer's subjective satisfaction with hair removal treatments

Defendants point out that the evidence shows that plaintiff's course of treatment, like that of the other HTGT customers, was customized to her skin tone and hair type, and targeted to specific body locations.  (Doc. 56 Ex. M)  Plaintiff's hyperpigmentation issue interfered with her course of treatment, preventing her from completing one year of treatment or the maintenance program.  Defendants assert that plaintiff's unique circumstances show how the Court would be unable to engage a formula to identify class members, ascertain which have claims, and then determine liability, causation and damage.

Plaintiff argues that it will not be necessary to inquire into the particular factors, listed above, as to each class member because this case involves common, uniform practices which were false and misleading to HTGT customers.  Rather, plaintiff asserts, the issue is whether the group requesting class status is seeking to remedy a common legal grievance.  Plaintiff points to *Davis v. Arco*, 371 F.Supp. 782 (N.D. Ohio 1974).  That case, however, is distinguishable.  *Davis* was a securities fraud case.  The court found that a complaint which alleges a course of conduct in which similar oral representations were made to all members of the class, commonality has been met.  And, predominance is satisfied where defendant conceded that a class action was proper where the activities giving rise to liability are standardized, as where uniform misrepresentations are made to all members of the group - and the complaint alleged standardized, uniform misrepresentations to all members of the

22

class.

So too here, plaintiff contends, the common operative facts regarding HTGT's uniform presentation of its services as being capable of eliminating unwanted hair when it could only reduce it, are facts common to all members.  Plaintiff asserts that these facts predominate over any individual matters.  Nor, plaintiff argues, is individualized reliance an issue because this case involves uniformity in advertising, common misrepresentations and standardized forms and consultations to which all members were exposed.  Plaintiff contends that this action is not about the end results achieved for each customer, whether hair was reduced or eliminated, but about whether HTGT had a basis for its representations regarding what it could achieve for its customers.

Here, while plaintiff may have been exposed to advertisements and she was exposed to statements in the brochure, her treatments were different from those who concluded the whole course plus maintenance.  As discussed earlier, this case does not turn on advertisements, but rather on the customer's actual hair removal result as well as the customer's subjective view about the success of the treatment.  The hair removal results will vary greatly among customers depending on many personal factors.   For this reason, plaintiff has not demonstrated commonality or predominance.

**(a) CSPA and fraud**

Defendants further argue that plaintiff's Ohio Consumer Sales Practices Act class cannot be certified as a matter of law.  For the following reasons, this Court agrees.

In *Marrone v. Philip Morris USA,* 110 Ohio St.3d 5 (2006), the Ohio Supreme Court held that a consumer may assert a class action claim under the CSPA only if the alleged

violation "is substantially similar to an act or practice previously declared to be deceptive by one of the methods identified in" Ohio Revised Code § 1345.09(B).  That statutory section

> provides that a consumer may qualify for class-action status only when a supplier acted in the face of prior notice that its conduct was deceptive or unconscionable. The prior notice may be in the form of (1) a rule adopted by the Attorney General under [Ohio Revised Code] § 1345.05(B)(2) or (2) a court decision made available for public inspection by the Attorney General under  [Ohio Revised Code] § 1345.05(A)(3).

*Id.* at 7.

Publicly available court decisions means that "prior notice may be in the form of 'an act or practice determined by a court of this state to violate section 1345.02 or 1345.03 of the Revised Code and ... made available for public inspection under division (A)(3) of section 1345.05 of the Revised Code.' [Ohio Revised Code] § 1345.09(B)."  *Id.* at 8.

With regard to the meaning of "a rule adopted by the Attorney General," the Ohio Supreme Court stated, "Prior notice may also be in the form of 'an act or practice declared to be deceptive or unconscionable by rule adopted [by the Attorney General] under division (B)(2) of section 1345.05 of the Revised Code.' " *Id.*

Defendants points out that a review of the Ohio Attorney General's Online Public Inspection File (www.opif.ag.state.oh.us) indicates no case, rule, or opinion relative to HTGT, the light pulse technology industry, or the hair removal industry.  Thus, defendants contend, absent any specific determination applicable to HTGT, class certification of the CSPA claim in precluded as a matter of law.

Plaintiff points to the Federal Trade Commission decision of  *FTC v. Removatron Intl. Corp.,* 111 F.T.C. 206 (1988), affirmed by the Eleventh Circuit in *Removatron Intl. Corp. v. FTC,* 884 F.2d 1489 (11th Cir. 1989).  That case, however, involved hair removal by a product

known as radio frequency energy tweezers and the decision applied to any other radio

frequency energy tweezer-type epilation devices. As defendants argue, that device is

different from the Epilight light pulse machine and, thus, that decision does not constitute

notice to HTGT. In *Marrone,* the Ohio Supreme Court stated that

> there must be a substantial similarity between a defendant's alleged violation of the
> Act and an act or practice previously declared deceptive by either a rule promulgated
> by the Attorney General or a court decision that was publicly available when the
> alleged violation occurred. 'Substantial similarity' means a similarity not in every
> detail, but in essential circumstances or conditions.

Moreover, as defendants point out, the Ohio Attorney General has not posted the FTC order

in the Ohio Public Inspections File.

Plaintiff asserts that there is a substantial similarity between defendants' alleged

violation of the CSPA and the act previously declared deceptive in *Removatron Intl.* because

the decision prohibited the making of unsubstantiated claims regarding the permanency of

hair removal which their device or "any other hair removal device" could achieve. That

decision, however, clearly involved the  radio frequency energy tweezers which has not been

shown to be at all similar to the Epilight light pulse machine.   Thus, defendants would not

have been put on notice.

For these reasons, *Marrone* precludes certification of the CSPA claim.

Defendants also contend that individualized questions of reliance preclude

certification of plaintiff's fraudulent misrepresentation and nondisclosure claims because

customer-by-customer mini-trials would have to be conducted to determine whether a

particular customer reasonably relied on anything HTGT said in its advertisements.[8]  This

Court agrees for the same reasons discussed earlier.

Additionally, case law shows that class certification in inappropriate where individual

testimony is required to determine reliance on representations.  *See Marks v. C.P. Chemical*

*Co., Inc*., 31 Ohio St.3d 200 (1987) (Plaintiffs alleged that home insulation manufactured,

distributed and installed by defendants, emitted a chemical causing present and future injury.

It was ultimately determined that class certification was unwarranted because the

predominance requirement was not satisfied where "[r]egardless of what was printed in

advertising or brochures, an individual determination would have to be made in every case as

to what the purchaser read or was told concerning the content of the product, as well as the

individual's reliance on those representations when making the decision to buy.") and *Linn v.*

*Roto-Rooter*, 2004 WL 1119619 (Ohio 8th App. Dist. May 20, 2004) (Common questions of

---

[8]     Relying on *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001),
        defendants additionally contend that this Court cannot certify plaintiff's claims
        because they are based on plaintiff's view of the ultimate effectiveness of the
        Epilight device, which allegation is akin to a "fraud on the FDA" claim which is
        precluded by the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040, as
        amended by the Medical Device Amendments of 1976, 90 Stat. 539. In *Buckman,*
        plaintiffs brought suit alleging that the regulatory consultant to the manufacturer
        of orthopedic bone screws made fraudulent representations to the FDA in the
        course of obtaining approval to market the screws that were serious enough to
        have played a substantial role in the events which resulted in plaintiff's injuries.
        The Supreme Court found the plaintiff's state law "fraud on the FDA"claims to be
        impliedly preempted by the FDCA, as amended by the MDA.  In so doing, the
        Court stated, "The relationship between a federal agency and the entity it
        regulates is inherently federal because it originates from, is governed by, and
        terminates according to federal law."   Defendants assert herein that the FDA
        alone has authority to regulate the Epilight device, and plaintiff's claims are an
        effort to regulate the device indirectly through litigation. Plaintiff, however, is not
        seeking  redress for noncompliance with federal regulations.

fact did not predominate over the potential class plaintiffs' allegations of fraud, unjust enrichment, and CSPA violations against plumbing corporations which added a miscellaneous supplies charge to each invoice, because other factors specific to each transaction existed. The court stated, "Absent an individual analysis of these factors, there is no way to determine [defendant's] liability under each of the plaintiff's claims. Because these factors require individualized inquiries, the trial court abused its discretion by finding common questions of fact predominate.")

Defendants also point to Tietz's affidavit testimony that HTGT's advertisements have conveyed slightly different messages at different times. Thus, Tietz avers that HTGT's initial brochure (provided by ESC and used by HTGT in 1998 and 1999) stated that hair is "eliminated," while its subsequent brochure (put in use in 2000) stated that hair is "effectively reduced." Tietz also avers that HTGT's radio advertisements were comprised of information taken from its brochures and customer testimonials taken from customer surveys. (Tietz aff. ¶¶ 14-18) Thus, customers who relied on a representation that hair would be eliminated might have a claim if the hair was only reduced. Those who read the brochure stating that hair would be reduced would not have a claim if in fact it was reduced or eliminated.

Furthermore, as discussed above, there is no evidence that plaintiff saw, heard, or read HTGT's advertisements (excluding the brochure she was given once entering the Toledo location).

Defendants also point out that plaintiff's allegation that defendants omitted material information that HTGT technologists were not certified by the Ohio Board of Medicine or were not permitted to perform the Epilight treatment only shows the individual nature of this

27

claim because plaintiff testified that she likened the HTGT facility to a spa, not a medical facility (pltf. depo. 178) while other customers may have had a different experience.

For these reasons, the CSPA and fraud claims are not appropriate for class certification. [9]

**(b) recission claim**

Finally, defendants argue that the recission claim does not establish the predominance requirement because plaintiff has no basis to "elect" the remedy of recission on behalf of the absent class members.  This Court agrees. Some customers may have been satisfied with their treatments and would not be entitled to a refund of their money.  Others, such as plaintiff, who allege personal injury, would not elect recission because the alleged damages may exceed the amount paid to HTGT (i.e., the amount of recission).

**(5) typicality**

---

[9]  Defendants argue that other reasons justify that this Court not certify a multi-state class. Defendants assert that plaintiff has no claim under the consumer protection laws of Illinois, Michigan, Indiana, Kentucky, or Wisconsin, and that there are significant differences among the various states' common law fraud elements. Defendants do not provide a detailed basis for these assertions.  Defendants assert that plaintiff's attempt to certify a class of customers in six states dating back to 1998 would require application of six different, sometimes conflicting, sets of state laws, variations of which would overwhelm common questions of law and fact.  Additionally, application of the different statutes of limitations would be difficult.  For instance, the Ohio CSPA sets forth a two year statute of limitations. O.R.C. § 1345.10.  Thus, Ohio customers' claims under the CSPA arising before April 21, 2001 (based on the initial class action complaint filed April 21, 2003) would be barred.  Defendants further assert that fraud claims arising even later in time would be barred by the statute of limitations as that claim was only added in the First Amended Complaint.  Thus, many members of the class (which dates to 1998) would not have a claim.  Moreover, defendants contend, state laws vary considerably as to punitive damages.  The Court need not reach these arguments.

"In order to meet the typicality requirement, the plaintiffs must show that their injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff." *Bacon*, 370 F.3d at 572 (citing *In re Am. Med.*, *supra*)

Plaintiff asserts that the typicality element is clearly met.  Plaintiff contends that HTGT's deceptive and misleading representations made in its marketing campaigns were common to the entire class.  For example, the following nearly identical representations were made, plaintiff argues: the phone number 1-877-NO HAIRS was listed in all the advertisements, radio scripts used words referring to "hair removal," "hair-free," "experienced technologist" and "permanently and safely."  And, plaintiff asserts, all members of the class were exposed to the common misrepresentations made through in-store pamphlets, in-store sales pitches based on scripts, or internet, newspaper, magazine and radio advertising.

Defendants assert that because plaintiff bases her claims on the ESC brochure or the oral statements of HTGT's technologists at the consultation and not on HTGT's advertisements, her claim is not typical of any other customer who asserts a claim based on HTGT's advertising. *See Stout v. J.D. Byrider*, 228 F.3d (6th Cir. 2000) (no typicality where plaintiffs' claims rested on their understanding of the purchasing transaction and each buyer's understanding of the terms, and because some buyers did not purchase the extended service agreement.)  Moreover, defendants assert that typicality is also lacking because plaintiff cannot establish that the HTGT treatments failed for other customers because they failed for her.

Plaintiff asserts that she was exposed to misrepresentations in HTGT's advertising and

that she responded to an advertisement and contacted a HTGT salon where she saw the brochures.

As discussed earlier, however, the deposition testimony does not show that plaintiff saw an ad for HTGT and then went to one of its salons as a result.  Therefore, to the extent that other customers went to the salons as a result of media advertising, plaintiff's claims are different from theirs.  Again, even assuming plaintiff did respond to a newspaper advertisement of HTGT, plaintiff cannot establish that the results of her treatments were unsatisfactory for the reasons others found their treatments to be unsatisfactory (if they indeed were not satisfied).

For these reasons, typicality is lacking.

**(6) adequacy of representation**

"This prerequisite is essential to due process, because a final judgment in a class action is binding on all class members."  *In re Am. Med*., *supra* (citations omitted). Two criteria are examined: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel."  *Id.*  Further, "The adequate representation requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members."  *Id.*  "In part, the adequacy of representation inquiry serves to uncover conflicts of interest between the named parties and the class they seek to represent." *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625-27 (1997) ).

Plaintiff submits her affidavit wherein she avers that as the class representative, she understands that she owes a duty to the class to place their interests ahead of her own. (Doc. 43) Counsel points to two citations wherein it litigated class action matters.

Defendants assert that plaintiff is not an adequate class representative because her personal claims conflict with the purported class claims based on advertising. Plaintiff's battery claim is premised on the alleged false and misleading representations for which she seeks compensatory and punitive damages. Yet, plaintiff elects recission for the class's claims based on the same false and misleading representations.

Plaintiff argues that there are no antagonistic claims and no conflict between her and the class.

For the same reasons that typicality is absent, plaintiff is not an adequate representative of the class.

### (7) Rule 23(b)(3) superiority

Defendants assert that plaintiff has not established that a class action is a superior means to adjudicate plaintiff's claims because "it would impose an insurmountable burden on the Court and the jury to separately adjudicate different claims" given the individualized analysis required. (Doc.56 at 33) Moreover, defendants contend, the claims involved are personal in nature and claimants should not be involuntarily subjected to proving a claim.

Plaintiff asserts that the common questions of law and fact- the misrepresentations regarding HTGT's service and the legal theories upon which her case is founded- predominate over any individual issues.

As discussed herein, however, this Court has determined that individualized analyses

31

are required and, therefore, a class action is not a superior means.

**Conclusion**

For the foregoing reasons, plaintiff's Motion for Class Certification is denied.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge


Dated: 1/10/07